(No. 19613.—

THE CITY OF PEKIN, Plaintiff in Error, *vs.* THE INDUS-
TRIAL COMMISSION *et al.*—(HULDA STROPE, Defendant
in.Error.)

*Opinion filed June 20, 1930—Rehearing denied October 8, 1930.*

C. I. MARTIN, Corporation Counsel, R. L. RUSSELL, and WILLIAM A. POTTS, for plaintiff in error.

HENRY MANSFIELD, DAVID J. COWAN, and ROBERT R. REYNOLDS, for defendant in error.

Mr. COMMISSIONER PARTLOW reported this opinion:

Defendant in error, Hulda Strope, the widow and administratrix of the estate of John Strope, deceased, on June 2, 1926, filed her claim for compensation against plaintiff in error, the city of Pekin, on account of the death of her husband, she being the only person dependent upon him for support. There was a hearing before an arbitrator, who made an award against plaintiff in error. On review the Industrial Commission set aside the award, and found that while the deceased on January 1, 1926, sustained an accidental injury which resulted in his death, the injury did not arise out of and in the course of his employment. A writ of *certiorari* was sued out of the circuit court of Tazewell county, the finding of the Industrial Commission was reversed and the cause remanded, with directions to confirm the award of the arbitrator. The case comes to this court on a writ of error.

Plaintiff in error maintains a wagon bridge, with a length of about 900 feet, over the Illinois river at Pekin. It has several spans, one of which is about 300 feet long

and is over the channel of the river. This span is so built that it can be opened to allow boats to pass. On the south side of this span, and about in the middle of it, is a cabin or house about eight by twelve feet for the use of the bridge tenders. It is heated by a stove and has in it a table, a telephone and the controls for the electric motor which moves the draw. The bridge is lighted by electricity at night. The roadway is eighteen feet wide, but vehicles are allowed to move in only one direction at a time across the draw span. The deceased was about sixty-five years of age and was in good health. From May 7, 1923, until the time of his death he was one of the bridge tenders on this bridge. He acted as a watchman, directed traffic and swung the draw on the approach of boats. He had nothing to do with keeping the bridge in repair or in oiling the machinery. His hours were from 5:30 o'clock in the evening until about the same hour next morning. On the evening of December 31, 1925, he went to work as usual. About 11:00 o'clock that night Carl Rasmussen, who lived in a houseboat on the river at the west end of the bridge, crossed the bridge and saw the deceased in the cabin, eating lunch. About 2:00 o'clock the next morning Rasmussen heard a knock on his back door. He found the deceased at the door. He was wearing a hat and had a flash-light. He said he was sick, and Rasmussen took him into the house and gave him a chair. Deceased said he had a pain in his right side and in his head. Rasmussen asked him if he had been struck by an automobile or had been slugged, and he said he had not. Rasmussen asked him if he had fallen, and he replied, "I don't know what happened." Rasmussen put him in bed and went to the cabin and called a doctor by telephone. When Rasmussen entered the cabin he found deceased's overcoat lying on the floor between the door and the stove. Nothing in the cabin had been disturbed. Dr. Balcke went to Rasmussen's houseboat about 3:30 o'clock that morning. He found the deceased had a large abrasion and bruises

on his left temple, there was a swelling extending upward towards the top of his head and down over the ear on the same side, there was a fracture at the base of the skull, there was an abrasion on the left wrist and bruises and fractured ribs on the right side. The doctor called the police station of plaintiff in error, reported that deceased had been seriously injured, and requested the police to notify his family. About 7:30 o'clock that morning deceased was taken in an ambulance to the home of his son, where he died a few hours later. He had $13 in bills in his clothes after he was injured. When he went to work that evening he wore a cap of heavy material. U. E. Bloompot, the day bridge tender, on the morning of January 1, 1926, found a cap on the metal sleeper of the bridge below the floor under the cabin. There were openings in the floor of the bridge at this point through which the cap might have fallen, but it was not identified as the cap worn by the deceased. Formal notices in writing of the injury, the death and the claim for compensation were served on the city clerk and city attorney of plaintiff in error on May 18, 1926.

Plaintiff in error contends that the deceased was a city official and not an employee of the city, and that the city was not liable under the exception in section 5 of the Workmen's Compensation act. Defendant in error contends that the ordinance which purports to create the office of bridge tender is invalid; that it does not prescribe the duties of the office and attempts to delegate that right to the bridge committee, and that, even if the ordinance is valid, bridge tenders are not city officials within the meaning of the Compensation act.

Section 5 of the Workmen's Compensation act provides that the term "employee," as used in the act, shall be construed to mean every person in the service of the State, county, city, town, township, incorporated village or school district, body politic or municipal corporation therein, under appointment or contract of hire, express or implied, oral

or written, except any official of the State, or of any county, city, town, township, incorporated village, school district, body politic or municipal corporation therein. Section 2 of article 6 of the City and Village act provides that every city council shall have power to provide for the election or appointment of such officers "as may by said council be deemed necessary or expedient." Section 3 of the same article provides that the city council may by ordinance not inconsistent with the provisions of the act, prescribe the duties and define the powers of all such city officers, together with the term of any such office, provided that the term shall not exceed two years.

Section 1 of chapter 6 of the ordinances of the city of Pekin provides that the mayor, by and with the advice and consent of the city council, at the first regular meeting of the council after the commencement of each municipal year, shall appoint three bridge tenders, each of whom shall be a citizen of the United States, a qualified elector residing within the city limits, and shall hold his office for the term of one year and until his successor is appointed and qualified. Article 2, chapter 14, of the same ordinance contains seven sections. The first section provides that there is created the office of three city bridge tenders, who shall be known as No. 1, No. 2 and No. 3, who shall be appointed and hold office as hereinbefore provided. Section 2 provides that each bridge tender shall, before entering upon the duties of his office, take an oath and execute a bond in the penal sum of $200, to be approved by the city council, for the faithful performance of the duties of his office. Section 3 provides that two or more of said bridge tenders shall be on duty at all hours and shall be subject to suspension or removal from office in certain instances. Section 4 provides that the bridge tenders shall be under the supervision and control of the bridge committee, who shall prescribe rules regulating the same and fixing the hours that the several bridge tenders shall be on duty. Section 5 pro-

vides that the bridge tenders shall, while on duty and while in the performance of the same, be vested with all the powers of a regular policeman of said city and are deemed and appointed policemen. Section 6 provides for the appointment by the mayor of temporary bridge tenders, and section 7 prescribes the salaries of the bridge tenders.

The deceased was first appointed bridge tender by the mayor and his appointment was confirmed by the city council on May 7, 1923. He took the oath of office and filed a bond, which was approved by the city council on May 10, 1923. He was re-appointed in May, 1924, and in May, 1925, and his appointment in each case was confirmed by the city council. No new bond was filed and the evidence does not show that a new oath was taken after his appointment in 1924 or in 1925.

In *People* v. *Coffin,* 282 Ill. 599, on page 606, it was said: "In many cases it is difficult to determine whether a person is an officer or merely an agent or employee of a municipality. It is even more difficult to lay down any fixed rule to determine the question, in all cases, as to whether a person is an officer or merely an agent or employee of a municipality. Generally, an officer takes an oath of office, while a mere agent or employee does not. The duties and services of a mere employee are purely ministerial, and he is not clothed with discretion nor with power to represent or bind the corporation. (28 Cyc. 585.) An office is a place in a governmental system created or recognized by the law of the State, which either directly or by delegated authority assigns to the incumbent thereof the continuous performance of certain permanent public duties. A position is analogous to an office in that the duties that pertain to it are permanent and fixed, but it differs from an office in that its duties may be non-governmental and not assigned to it by any public law of the State. An employment differs from both an office and a position in that its duties, which are non-governmental, are neither certain nor permanent."

An office is a public station conferred by appointment of the government, and the term embraces the idea of tenure, duration, emoluments and duties. (*Hughes* v. *Traeger,* 264 Ill. 612.) An officer, in the sense used in the City and Village act, is one who has not only been elected or appointed, but who has qualified, as the law directs, by giving bond and taking an oath of office. (*Crook* v. *People,* 106 Ill. 237; *People* v. *Cincinnati, Lafayette and Chicago Railway Co.* 247 id. 506.) In *City of Chicago* v. *Industrial Com.* 291 Ill. 23, it was held that a police patrolman of the city of Chicago was a city official and was not entitled to compensation under section 5 of the Compensation act. The deceased in this case was appointed under an ordinance of the city. His appointment was confirmed by the city council, he was required to take an oath of office, give a bond, he was to hold his office for one year and until his successor was appointed and qualified, and he was vested with the authority of a police officer. He had charge of the bridge while he was on duty. A bridge tender was to be on duty at all hours of the day and night. It was the duty of the bridge tenders to regulate traffic, and in so doing they had the authority of a policeman to enforce their orders. It was their duty to open the draw and let boats pass and to regulate one-way traffic on the bridge. These duties required the exercise of discretion and judgment. The bridge tenders were officers of the city and not mere employees, and therefore they were not entitled to compensation under the Compensation act.

The ordinance provided that the bridge tenders should be under the supervision and control of the bridge committee, which was given power to prescribe rules regulating the same and fix the hours the several bridge tenders were to be on duty. This provision did not mean that the city council had delegated legislative power to the bridge committee. A city council cannot delegate legislative authority vested in it, but it may authorize others to do those things

which it might properly but cannot understandingly or advantageously do. (*City of Chicago* v. *Matthies*, 320 Ill. 352; *Spiegler* v. *City of Chicago*, 216 id. 114.) The ordinance sufficiently specified the duties of the bridge tenders and did not delegate legislative authority to the bridge committee.

Defendant in error insists that the provision of the ordinance which provides that the term of office shall be one year and until a successor is appointed and qualified is invalid because it authorizes a term which may extend longer than two years, contrary to the provision of the statute. If this provision be construed to authorize an officer appointed to hold office for more than two years it would to that extent be invalid, (*Kenneally* v. *City of Chicago*, 220 Ill. 485,) but in so far as it fixes the term of office at one year and until a successor is appointed and qualified it is not invalid. Where the tenure of an office is vested for a specified period of time and until a successor shall be elected or appointed and qualifies, the mere expiration of the specified period of time for the duration of the term of office does not operate to vacate the office or to impair the powers of the officer to continue to act. *Trustees of Schools* v. *Cowden*, 240 Ill. 39; *People* v. *Township Supervisors*, 100 id. 332; Mechem on Public Officers, sec. 397.

Defendant in error contends that deceased at the time of his death was not an officer *de jure* because he did not take an oath of office and file a bond after his original appointment in 1923. An officer *de jure* is one who is in all respects regularly appointed and qualified to exercise the office. (*People* v. *Brautigan*, 310 Ill. 472.) When the deceased was first appointed, filed his bond and took the oath of office he became a *de jure* officer of the city. He was not an employee of the city at that time. When he failed to file a new bond and take a new oath after his re-appointment in 1924 he did not cease to be a *de jure* officer but continued to exercise the powers, duties and authority of

the office. Therefore his widow was not entitled to compensation within the provisions of the Compensation act, and the circuit court was in error in so holding.

It is insisted that notice was not served upon the city within the time provided by the statute and that the deceased was not injured in the course of his employment. It will not be necessary to consider either of these questions.

For the reasons indicated the judgment will be reversed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment reversed.*