SUSAN J. McDUNN, Petitioner-Appellee, v. JAMES H. WILLIAMS, Respondent-Appellant (The Board of Election Commissioners for the City of Chicago *et al.*, Respondents).

First District (3rd Division)   No. 1—92—1109

Opinion filed September 30, 1992.

GREIMAN, P.J., concurring in part and dissenting in part.
SCARIANO, J., concurring in part and dissenting in part.

William J. Harte, Ltd., and Richard Flowers, both of Chicago (William J. Harte, Richard Flowers, Joseph E. Tighe, and Cortney C. Nottage, of counsel), for appellant.

Lavelle, Holden & Juneau, Ltd., of Oak Park (Michael E. Lavelle, of counsel), for appellee.

JUSTICE TULLY delivered the opinion of the court:
This is the second time this case is presented to this court for review. The facts leading to the first appeal were previously set out in *McDunn v. Williams* (1990), 204 Ill. App. 3d 332, 562 N.E.2d 255 (*McDunn I*). In that case, we reversed Judge Joseph Schneider's ruling that Susan J. McDunn, the petitioner, had not timely filed her election contest petition and remanded the case to the trial court for further proceedings. We will set out the additional pertinent facts which have occurred since the first appeal.

After this court reversed the trial court on September 28, 1990, in *McDunn I*, respondent, James H. Williams, filed a petition for leave to appeal with the Illinois Supreme Court which was denied on October 24, 1990. (*McDunn v. Williams* (1990), 135 Ill. 2d 558, 564 N.E.2d 839.) On October 30, 1990, the parties returned to the trial court before Judge Michael J. Murphy, who had been assigned to the case. On that date, Judge Murphy ordered the parties to prepare for argument on a motion to dismiss McDunn's complaint filed by Williams pursuant to section 2—615 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—615), as well as to prepare for trial in the event the motion was denied. On October 31, 1990, the

trial court found that McDunn's complaint was sufficient in law and denied the motion to dismiss. Accordingly, the trial court ordered that McDunn would present her case on November 2, 1990. On November 5, 1990, McDunn closed her case and the matter was continued to November 19, 1990, for Williams to present his evidence.

On November 5, 1990, the eve of the general election, the ballots had been printed with Williams' name as the unopposed candidate of the Democratic Party for the office of judge of the circuit court, Cook County judicial district, to fill the vacancy of Judge Roger J. Kiley, Jr. On that date, the trial court entered an order that provided, *inter alia*:

> "The election to fill the vacancy of Roger Kiley shall proceed. The results of the election shall be suppressed by the [Chicago Board of Election Commissioners (CBEC)] until further order of court. The suppression shall enjoin the CBEC from preparing an abstract to be forwarded to any party or governmental agency without order of court. The CBEC may tabulate the results during the counting period, on election night, but shall not issue any announcement as to the winner until further order of court."

However, no order was ever entered directing the CBEC to rescind its March 1990 and April 1990 declarations of Williams as the winner of the Democratic primary or to strike his name from the ballot.

On November 6, 1990, the general election was held. There were no write-in candidates. On November 13, 1990, the CBEC filed its statement of the results of the canvass of the election returns with the clerk of the circuit court of Cook County indicating, *inter alia*, that 163,022 people in the City of Chicago had voted a straight Democratic Party ticket. However, in the CBEC's statement, instead of listing a winner for the Kiley vacancy, it stated: "PROCLAMATION WITHHELD DUE TO COURT ORDER."

On November 20, 1990, Harry G. Comerford, chief judge of the circuit court of Cook County, sent Williams a letter congratulating him on his election as a judge of the circuit court of Cook County and instructing him where to take the oath of office. On November 26, 1990, Governor James R. Thompson and Secretary of State Jim Edgar executed and issued their proclamation of the election of judges wherein Williams was proclaimed, subject to litigation, the person elected to fill the Kiley vacancy. On December 3, 1990, Williams presented himself before Chief Judge Comerford and executed an oath of office.

On December 7, 1990, the trial court issued a memorandum decision ordering a full recount of all the ballots in the March 1990 Democratic primary election. It was not until November 15, 1991, that the CBEC filed a complete and revised "STATEMENT OF THE RESULTS OF THE CITY-WIDE RECOUNT FOR THE JUDGE OF THE CIRCUIT COURT—HON. ROGER J. KILEY, JR. VACANCY." The CBEC, in conducting its recount, could not locate ballots for eight precincts in the City of Chicago. Consequently, the CBEC was forced to rely upon precinct reports, not the actual ballots from those eight precincts, in order to tabulate its results.

The recount results showed that Williams received a total of 106,473 votes and McDunn received a total of 106,274 votes. These figures included both votes from the missing eight precincts and ballots uninitialed by election judges in violation of election laws. The precinct reports from the eight missing precincts showed the vote totals to be 302 for Williams and 279 for McDunn. The uninitialed ballots totaled 1,519 for Williams and 1,153 for McDunn. If the uninitialed ballots are subtracted, Williams is left with 104,954 votes and McDunn is left with 105,121 votes. It is important to note that both parties stipulated that there were no allegations of fraud before the trial court. However, Williams did not admit to the propriety of the vote totals for the eight missing precincts.

On March 23, 1992 Judge Murphy entered a memorandum decision and order ruling in favor of McDunn on the issue of the uninitialed ballots, and declared her to be the winner of the March 1990 Democratic primary election, and ordered her name to appear on the November 3, 1992, general election ballot as the Democratic Party's nominee to fill the Kiley vacancy. It is from that memorandum decision and order that Williams appeals to this court.

On appeal, Williams contends: (1) petitioner's election contest arising out of the March 1990 primary election was mooted by the November 1990 general election, where respondent ran unopposed, and by respondent's execution of the oath of office as an elected judge; (2) petitioner's election contest was not timely; (3) the doctrine of *laches* bars petitioner's election contest; (4) the trial court erred when it refused to count the uninitialed ballots cast by voters in the March 1990 primary election when,. in the absence of fraud, those ballots were not initialed by the election judges as prescribed by the Election Code; (5) the trial court erred when it found in favor of petitioner on petitioner's election petition when the actual ballots for eight precincts could not be found; (6) the trial court was without the power to order that the petitioner's name be placed upon the November 3,

1992, general election ballot; and (7) the trial court's refusal to recognize the effect of the November 1990 general election deprived respondent and those who voted for him of their constitutional rights of suffrage by nullifying their votes cast in that general election.

## I. MOOTNESS

We first consider whether McDunn's election contest was mooted by the November 1990 general election, where Williams ran unopposed, and by his execution of the oath of office. "A case is considered moot when it 'presents or involves no actual controversy, interests or rights of the parties, or where the issues have ceased to exist.'" *People v. Boclair* (1987), 119 Ill. 2d 368, 373, 519 N.E.2d 437, 439, *cert. denied* (1987), 484 U.S. 950, 98 L. Ed. 2d 367, 108 S. Ct. 340, quoting *People v. Redlich* (1949), 402 Ill. 270, 278-79, 83 N.E.2d 736, 741.

Williams' basic argument is that McDunn's appeal is moot because (1) it is now over 1½ years since the November 1990 general election in which he was elected and (2) he has been sworn into office. Thus, the outcome of this case has no effect because Williams has already taken office.

For this proposition, Williams relies upon *Harris v. Education Officers Electoral Board of Community Consolidated School District 110* (1990), 203 Ill. App. 3d 917, 561 N.E.2d 204, and *Bartos v. Chicago Board of Elections* (1989), 191 Ill. App. 3d 937, 548 N.E.2d 431. However, we believe such reliance is misplaced.

In *Harris*, the trial court upheld the decision of the election board to place a candidate's name on the ballot for election to the school board. The election took place, the candidate was elected and took office. Accordingly, the *Harris* court ruled that any decision it might render "would have no practical effect on the parties or the controversy between them." *Harris*, 203 Ill. App. 3d at 920, 561 N.E.2d at 206.

In *Bartos*, the plaintiff attempted to file an intent to be a write-in candidate of the Solidarity Party for the office of mayor of the City of Chicago at a special mayoral election. The CBEC denied Bartos' request on the basis of its untimeliness. Bartos then filed a petition in the circuit court of Cook County seeking review of the CBEC's action. The trial court dismissed Bartos' petition. Subsequently, the election was held and the winner was installed as mayor. Consequently, the *Bartos* court held that no relief could be granted to the plaintiff and dismissed his appeal.

In the present case, unlike the situations in either *Harris* or *Bartos*, the trial court enjoined the CBEC from preparing an abstract and issuing any announcement of a winner. No such order was in place in either *Harris* or *Bartos*. The elections in those cases pressed forward unencumbered by the litigation. While it is true that the November 1990 general election was held, the trial court's suppression of the election results maintained the status quo and prevented Williams from being elected and assuming office. Thus, Williams' execution of an oath of office, while not enjoined by the trial court's order, was without effect as he was never unequivocally declared to be the winner of the election. (See *Welch v. Johnson* (1992), 147 Ill. 2d 40, 588 N.E.2d 1119 (removal of candidate's name from ballot not a moot issue as no one had been both elected and qualified for the office); see also *City of Pekin v. Industrial Comm'n* (1930), 341 Ill. 312, 173 N.E. 339.) Accordingly, the trial court properly concluded McDunn's election contest was not moot.

## II. TIMELINESS OF ELECTION PETITION

■ Williams' next contention is that McDunn's election contest was not filed timely. Williams argues that this court's decision in *McDunn I* decided solely the issue of whether McDunn's initial petition filed on April 19, 1990, was timely filed and did not address whether McDunn's amended petition was timely or permissible.

We need not reach this issue as "[i]t is settled that no question which was raised or which could have been raised in a prior appeal on the merits can be urged on a subsequent appeal. *** [W]here a question was open to consideration in a prior appeal and it could have been presented but was not, the question will be deemed to be waived." (*Turner v. Commonwealth Edison Co.* (1978), 63 Ill. App. 3d 693, 698, 380 N.E.2d 477, 481. See also *Kazubowski v. Kazubowski* (1970), 45 Ill. 2d 405, 259 N.E.2d 282, *cert. denied* (1970), 400 U.S. 926, 27 L. Ed. 2d 186, 91 S. Ct. 188.) Williams had the opportunity to bring this question before this court in *McDunn I* but did not do so. Consequently, it is deemed waived and barred by the doctrine of *res judicata*.

## III. LACHES

Williams also raises the question of whether the doctrine of *laches* bars McDunn's election contest. In support of this proposition, Williams relies solely upon the holding of the Illinois Supreme Court in *Tully v. Illinois* (1991), 143 Ill. 2d 425, 574 N.E.2d 659, wherein the court found:

"*Laches* is an equitable doctrine which precludes the assertion of a claim by a litigant whose unreasonable delay in raising that claim has prejudiced the opposing party. [Citation.] The doctrine is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party. [Citation.] Two elements are necessary to a finding of *laches*: (1) lack of diligence by the party asserting the claim and (2) prejudice to the opposing party resulting from the delay." *Tully*, 143 Ill. 2d at 432, 574 N.E.2d at 662.

In *Tully*, plaintiff Tully and defendant White asserted in the trial court that each was entitled to the same seat on the First District of the Illinois Appellate Court based on the results of the general election held on November 6, 1990. White's 10-year term, to which he was elected, was scheduled to expire December 3, 1990. The Compulsory Retirement of Judges Act provides, in pertinent part, that "[a] judge is automatically retired at the expiration of the term in which the judge attains the age of 75." (Ill. Rev. Stat. 1989, ch. 37, par. 23.71.) White attained the age of 75 in 1989. Nevertheless, White sought to be retained, contending that the compulsory retirement of judges was unconstitutional and in violation of the Federal Age Discrimination in Employment Act (29 U.S.C. §621 *et seq.* (1988)) and timely filed his declaration of candidacy for retention. In December 1989 the State Board of Elections accepted nominating petitions from candidates, including Tully, who sought to run for White's seat in the primary elections, which was vacant due to White's mandatory retirement. Thereafter, Tully's name and others were placed on the primary election ballot. Tully was elected the Democratic Party's nominee to fill the White vacancy in the primary election held on March 20, 1990. In August 1990 the State Board of Elections directed both that White's name be placed on the judicial retention ballot and that Tully's name be placed on the judicial election ballot at the general election to fill the vacancy created by White's retirement.

On October 4, 1990, after learning of these facts, Tully filed an action in the circuit court of Cook County seeking to have White declared ineligible to be retained for another term. The circuit court entered an order to maintain the status quo. In the November 1990 election, White was retained and Tully was elected to fill the White vacancy.

Thereafter, White answered Tully's complaint and filed an affirmative defense asserting that the mandatory retirement of judges was unconstitutional. The circuit court held in favor of White on the con-

stitutional issue and declared that Tully's election was null and void. Tully appealed directly to the Illinois Supreme Court.

On appeal, the supreme court reversed the circuit court, without reaching the constitutional issue, and held that White could not challenge Tully's election to the appellate court pursuant to the doctrine of *laches*. The *Tully* court focused on (1) the fact White was aware that candidates were running to fill a vacancy caused by his mandatory retirement and did not raise any objection to their candidacies until after the election and (2) that those candidates were expending considerable time, energy, and money on their campaigns.

■ We believe that none of the facts present in *Tully* are similar or analogous to those of this case. McDunn timely filed her contest petition 10 days after the State Board of Elections canvass. McDunn then timely filed her first appeal with this court after her case was dismissed in the trial court, and the mandate of this court, reversing the trial court, came down on September 28, 1990, after which the trial court proceeded to hear evidence. The record is devoid of any facts that suggest McDunn has exhibited a lack of diligence. In fact, both sides to this controversy have demonstrated nothing but capable and zealous advocacy of their respective positions. Accordingly, the first element of *Tully* has not been met and, therefore, we do not find McDunn guilty of *laches*.

### IV. UNINITIALED BALLOTS

■ We next consider whether the trial court erred when it refused to count the uninitialed ballots cast by voters in the March 1990 primary election when, in the absence of fraud, those ballots were not initialed by the election judges. Section 7—44 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 7—44) provides, in pertinent part:

> "[An election judge in a primary] shall give to [a voter] one, and only one, primary ballot of the political party with which he declares himself affiliated, on the back of which such primary judge shall endorse his initials in such manner that they may be seen when the primary ballot is properly folded."

Sections 19—9 and 24A—10.1 of the Election Code impose this requirement on absentee ballots. (Ill. Rev. Stat. 1989, ch. 46, pars. 19—9, 24A—10.1.) Section 7—51 of the Election Code requires that "[n]o primary ballot, without the endorsement of the judge's initials thereon, shall be counted." (Ill. Rev. Stat. 1989, ch. 46, par. 7—51.) Section 24A—10.1 of the Election Code further requires:

"The judges of election shall [after the closing of the polls] examine all ballot cards and ballot card envelopes which are in the ballot box to determine whether the ballot cards and ballot card envelopes contain the initials of a precinct judge of election. If any ballot card or ballot card envelope is not initialed, it shall be marked on the back 'Defective', initialed as to such label by all judges immediately under the word 'Defective' and not counted." Ill. Rev. Stat. 1989, ch. 46, par. 24A—10.1.

The Illinois Supreme Court and the appellate court have held that the Election Code's ballot-initialing requirements are mandatory and that a ballot not meeting those requirements shall not be counted. *Pullen v. Mulligan* (1990), 138 Ill. 2d 21, 49, 561 N.E.2d 585, 596-97; *Craig v. Peterson* (1968), 39 Ill. 2d 191, 194, 233 N.E.2d 345, 347; *Morandi v. Heiman* (1961), 23 Ill. 2d 365, 368, 178 N.E.2d 314, 319-20; *Tuthill v. Rendelman* (1944), 387 Ill. 321, 330, 56 N.E.2d 375, 381; *Snow v. Natzke* (1986), 140 Ill. App. 3d 367, 369, 488 N.E.2d 1077, 1078; *Goble v. Board of Education of Iuka Community Consolidated School District No. 7* (1980), 83 Ill. App. 3d 284, 285, 404 N.E.2d 343, 345.

However, in *Pullen* and *Craig* the supreme court has held the Election Code's ballot-initialing provisions are directory, rather than mandatory, with regards to some uninitialed absentee ballots and has allowed such ballots to be counted. *Pullen*, 138 Ill. 2d at 52, 561 N.E.2d at 598; *Craig*, 39 Ill. 2d at 201-02, 233 N.E.2d at 351.

In *Pullen*, the seminal decision in this area of the law, the supreme court applied the holding of *Craig*, which established a two-prong test for when uninitialed *absentee ballots* are allowed to be counted. "Under *Craig*, uninitialled absentee ballots may be counted only if: (1) the absentee ballots can be *identified* and *distinguished* from in-precinct ballots; and (2) the initialling requirement does not contribute to the integrity of the election process." (Emphasis added.) *Pullen*, 138 Ill. 2d at 52, 561 N.E.2d at 598.

In the case at hand, all of the ballots were paper ballots. There is no evidence in the record to suggest that any of the uninitialed ballots were, in fact, absentee ballots. While it is true that some of them may have been absentee ballots, it remains uncontroverted that the absentee ballots cast in the March 1990 primary were indistinguishable from and commingled with those ballots cast in the precinct. Thus, the two-prong test is inapplicable here.

Nevertheless, Williams urges that the holdings of *Pullen* and *Craig* should be expanded to allow the counting of all uninitialed ballots cast by voters in the absence of allegations of fraud. The argu-

ment is that in the absence of fraud, the initialing requirement lends nothing to the electoral process and serves only to disenfranchise voters who, through no fault of their own, have their ballots go uncounted due to the innocent error of an election judge.

We believe the *Pullen* court drew a distinction between in-precinct ballots and distinguishable absentee ballots, and recognized the policy concerns underlying the ballot-initialing requirements when it stated:

> "Applying the initialling requirement to *in-precinct* ballots is certainly necessary to preserve the integrity of the election, because the initials provide the only means by which the election officials can identify and separate the legally cast from the illegally cast in-precinct ballots. Thus, here, as in *Craig*, application of the initialling requirement to in-precinct ballots prevented fraudulent practices, such as stuffing the ballot box." *Pullen*, 138 Ill. 2d at 53, 561 N.E.2d at 599.

Moreover, the initialing requirement also serves a preventative function in that an individual who is tempted to stuff a ballot box knows that such efforts would prove fruitless as the precinct election judges check each ballot for their initials and would, pursuant to the statutory scheme, refuse to count a ballot without such initials. Accordingly, we are unwilling to carve out an exception to the Election Code's initialing requirement and find that the trial court did not err in refusing to count the uninitialed ballots.

### V. MISSING BALLOTS

■ Williams next argues that the trial court erred when it found in favor of McDunn on her election petition when the ballots for eight precincts could not be found. Williams asserts that as the ballots for eight precincts could not be found, the recount ordered by the trial court could not be properly or accurately accomplished. Accordingly, there is no way to determine with any surety whether all of the ballots in those eight precincts were properly counted and initialed by the judges of election and, therefore, there is no way McDunn can say she is, in fact, the winner of the March 1990 primary.

For his argument that all ballots must be recounted in order for there to be a full valid recount, Williams relies on *Hennessy v. Porch* (1910), 247 Ill. 388, 93 N.E. 290. However, in *Hennessy*, unlike the situation in the present case, all of the actual ballots were available to the trial court and were recounted. The *Hennessy* court never addressed the issue of whether precinct reports or other substitute evidence could be used in a recount.

Illinois courts have been confronted with the issue of ballots which could not be located or properly preserved in a way to ensure against tampering. (See *Pullen*, 138 Ill. 2d 21, 561 N.E.2d 585; *Talbott v. Thompson* (1932), 350 Ill. 86, 182 N.E. 784; see also *Armbrust v. Starkey* (1954), 3 Ill. 2d 131, 119 N.E.2d 910; *MacWherter v. Turner* (1964), 52 Ill. App. 2d 270, 201 N.E.2d 325.) Addressing this issue, the *Pullen* court stated:

> "The returns of the election officials are *prima facie* evidence of the result of the election. The ballots, however, are the original evidence of the votes cast. In an election contest, the court may accept the ballots at the election as better evidence of the result than the election returns if those ballots have been properly preserved. [Citations.] The contestant, as the moving party, bears the burden of proving that the ballots have been kept intact. [Citation.] If the evidence discloses that the ballots were exposed to the reach of unauthorized persons, and the returns are not likewise discredited, the ballots will not be regarded as better evidence of the result of the election. If the evidence shows that there was no reasonable opportunity for tampering with the ballots, however, they are the best evidence of the results of the election." *Pullen*, 138 Ill. 2d at 72, 561 N.E.2d at 607-08.

In the present case, the ballots for eight precincts could not be located. Thus, it is impossible to demonstrate that the ballots from those precincts were properly preserved and are, therefore, the best evidence of the election results. Since there was no evidence presented at trial to cast doubt upon the returns for those eight precincts, the trial court correctly concluded that those returns are *prima facie* evidence of the votes cast in the missing precincts. The fact that some ballots in other precincts were uninitialed by election judges is insufficient to show that the ballots, upon which the missing eight precincts were based, were also not initialed. Accordingly, the precinct returns from the missing eight precincts were properly admitted as evidence of the votes cast in those precincts.

### VI. SECTION 7—63 OF THE ELECTION CODE

■■ Williams argues that the trial court was without the power to order McDunn's name to be placed upon the November 3, 1992, general election ballot. Williams claims there is no express statutory authority for the trial court to have ordered a special election.

We disagree. Section 7—63 of the Election Code expressly grants a court the power to "make such orders and enter such judgment as

946

justice may require." (Ill. Rev. Stat. 1989, ch. 46, par. 7—63.) Had the State legislature intended to delineate or limit the relief a court could order in an election contest, it surely would have done so explicitly within the context of as comprehensive a scheme as the Election Code. Clearly, the remedy ordered by the trial court was within the broad scope of power granted to it by the General Assembly. Were we to hold that the trial court did not possess the power to order Mc-Dunn's name placed on the November 3, 1992, general election ballot, we would, in effect, be ruling that a trial court could only render advisory opinions in election contests and that candidates similarly situated to McDunn have no remedy.

## VII. EQUITABLE RELIEF

■ Williams finally argues that the refusal by the trial court to recognize the effect of the November 1990 general election deprived Williams and those who voted for him in that election of their constitutional rights of suffrage by nullifying their votes cast in that general election. As we have concluded that Williams' name was incorrectly placed on the ballot in the first place, it logically follows that he and other voters had no right, constitutional or otherwise, to vote for him as the duly qualified candidate of the Democratic party. However, because of the extenuating circumstances present in this case and in fairness to all parties, including the voters of Cook County, we will further examine this issue.

Section 7—63 of the Election Code, as well as Supreme Court Rule 366(a)(5), empowers this court to fashion a remedy in the interests of fairness and equity to the parties engaged in an election dispute. (107 Ill. 2d R. 366(a)(5); see generally *Harriss v. Elliott* (1991), 207 Ill. App. 3d 384, 565 N.E.2d 1041; *Leckrone v. City of Salem* (1987), 152 Ill. App. 3d 126, 503 N.E.2d 1093; *Hebb v. Beegle* (1985), 135 Ill. App. 3d 157, 481 N.E.2d 846; *Steward v. Yoder* (1980), 86 Ill. App. 3d 223, 408 N.E.2d 55; *George F. Mueller & Sons, Inc. v. Volpe* (1979), 74 Ill. App. 3d 879, 394 N.E.2d 51.) Although a strict application of the election rules would declare petitioner the winner in this contest, we cannot ignore the fact that Williams actually received a larger number of votes than McDunn. Moreover, respondent's name was thereafter placed upon the ballot in the November 1990 general election. The voters of Cook County then cast their votes for respondent, believing him to be the validly elected winner of the Democratic primary.

We cannot now deny the electorate of Cook County basic and fundamental right to vote *post facto*. In *Kluk v. Lang* (1988), 125 Ill. 2d

306, 317, the Illinois Supreme Court described the right to vote most accurately when it stated:

> "The essence of the democratic voting right is that it is equally and separately vested in each member of the electorate. The right to vote is not a common right of the public. *** Rather, the voting right is by definition capable of being exercised individually by each voter; indeed, this is its genius. The right to be represented is intertwined with the right to vote and is likewise personal to each voter."

The failure of the electoral and legal systems in this instance to expeditiously resolve this dispute prior to the general election should neither be imputed to the electorate nor to the respondent. The election laws were not intended to deprive the voters of their rights but to protect the propriety and dignity of the election process. It is in this spirit of the law that we now choose to fashion an equitable remedy.

While it is the duty of this court to insure the integrity of the election process, it is also our duty to guarantee the individual and constitutional rights of the electorate. We therefore order that James H. Williams shall continue to serve in the office of judge of the circuit court of Cook County until his resignation, retirement or failure to be retained, while simultaneously ordering the placement of Susan J. McDunn's name on the November 3, 1992, general election ballot to fill the judicial vacancy of the Honorable Roger J. Kiley, Jr.

The decision of the circuit court of Cook County is hereby affirmed.

Affirmed.

PRESIDING JUSTICE GREIMAN concurring in part and dissenting in part:

I concur with the majority regarding the issues of the timeliness of election petition (part II of the majority opinion), laches (part III), uninitialed ballots (part IV), missing ballots (part V), and section 7—63 of the Election Code (part VI). However, I must respectfully dissent from the majority's conclusions relating to mootness (part I) in determining who shall succeed to the judicial vacancy which is the subject matter of this appeal.

The Illinois General Assembly has provided that an election judge's initials shall be endorsed upon each ballot (Ill. Rev. Stat. 1989, ch. 46, par. 7—44), that ballots without such endorsement shall not be counted (Ill. Rev. Stat. 1989, ch. 46, par. 7—51), and that in examining the ballots at the close of the polls, the election judges shall mark

each uninitialed ballot as being "defective" (Ill. Rev. Stat. 1989, ch. 46, par. 24A—10.1). The majority notes that there is a clear line of authority which seemingly holds the ballot-initialing requirement to be mandatory and that an uninitialed ballot will not be counted.

The majority, however, observes that in *Pullen* and *Craig* the supreme court held that the initialing requirement was directory rather than mandatory if the ballots in question could be identified and distinguished from other ballots so that other factors might be considered in determining the integrity of the election process. *Pullen v. Mulligan* (1990), 138 Ill. 2d 21, 561 N.E.2d 585; *Craig v. Peterson* (1968), 39 Ill. 2d 191, 233 N.E.2d 345.

*Pullen* carves out an exception to the statute as to uninitialed absentee ballots distributed from the central election department of the county clerk and identified differently than in-precinct ballots, so that the integrity of the election process could be preserved even if uninitialed absentee ballots were counted.

The cutting edge of *Pullen* was the court's recognition of the proper purpose of the mechanics of election and giving effect to the voters' will in certain instances even though there had not been strict compliance with statutory provisions of the Election Code.

In the instant case, the parties have stipulated that no fraud was present and none alleged. Moreover, the record, as well as the majority opinion, indicates that the parties acted in good faith and attempted to have their rights litigated in a timely fashion.

In the 1990 general election, Williams was elected by more than 163,000 votes.[1] However, the trial court on the eve of election ordered the Chicago Board of Election Commissioners to suppress the results of the election and at the time of the proclamation of the results stated: "PROCLAMATION WITHHELD DUE TO COURT ORDER."

Shall we disenfranchise hundreds of thousands of people that voted in the general election because of the technical errors of a few election clerks during the primary with reference to a tiny percentage of the ballots counted? We must weigh the rights of the voters in the general election with those interests of the voters in the primary.

Judicial offices are at the "bottom" of the ballot. Can we imagine what the majority's decision might be if the election involved the governor of our State? At the same 1990 primary election, then Secre-

---

[1]In the 1990 general election, voters elected two other judicial officers from the same geographical area as this contested vacancy. In those races, the Democratic candidates averaged 446,000 votes each. Illinois State Board of Elections, *Official Vote Cast at the General Election November 6, 1990.*

tary of State Jim Edgar was opposed in the Republican primary. Had the Secretary of State and his primary opponents been engaged in the same kind of vote count as the parties here, can anyone imagine that the then Secretary of State Edgar and Attorney General Neil Hartigan, the nominees of the Republican and Democractic parties respectively, would have each spent $8 million or $9 million in the promotion of their candidacies where the court might determine afterwards that it was all an exercise in futility?

*Bartos v. Chicago Board of Elections* (1989), 191 Ill. App. 3d 937, 548 N.E.2d 431, provides us with the precise kind of treatment these issues might receive if the office were at the "top" of the ballot rather than the "bottom" of the ballot. In *Bartos*, plaintiff sought to file an intent to be a write-in candidate of the Solidarity Party for the office of mayor of the City of Chicago at the 1989 special mayoral election. The Board of Election Commissioners denied the request based on its untimeliness and the plaintiff appealed. While the case pended in the appellate court, the 1989 mayoral primary election passed, as did the 1989 mayoral general election and the winner of that election was proclaimed and installed as mayor.

The appellate court in *Bartos* held that the plaintiff's right to have his filings accepted for the February 28, 1989, primary had ceased to exist after the election was held and that his cause was then moot. The majority here answers *Bartos* by suggesting that it is the trial court's suppression of the announcement by the Board of Election of the election results that takes the case at bar out of the deep well of mootness. Just as the *Bartos* court was unwilling to order a new mayoral election to allow Mr. Bartos to assert his candidacy, we should similarly lay this matter to rest.

For the reasons expressed, I would carve out an additional exception to that provided in *Pullen*. In the absence of fraud or bad faith and where the record does not reveal that the adverse party has delayed the process, I believe the results of the general election should be given effect in order not to disenfranchise hundreds of thousands of voters in that election, notwithstanding the technical defects in a few primary ballots.

If the parties are innocent victims of the process, where does fault lie? As with Brutus, fault lies not in our stars but in ourselves. (William Shakespeare, Julius Caesar act I, sc. 2.) Illinois primaries are held 7½ months before the general election, which should be ample time for our election tribunals and our courts to resolve primary election contests.

Consider that some States have a mere seven weeks between primary and general elections. Whether by new legislative initiatives or supreme court rule, we should consider development of summary and expedited procedures to insure that the will of the electorate is not again frustrated.

I appreciate the effort to guarantee individual and constitutional rights of each voter by giving *de jure* recognition to James H. Williams to continue to serve in the office of judge of the circuit court of Cook County until resignation, retirement or failure to be retained and I concur as to part VII providing equitable relief.

JUSTICE SCARIANO, concurring in part and dissenting in part:

Although I concur in Justice Tully's decision to affirm the judgment of the trial court in this cause, I respectfully dissent from the majority's determination to enact what may very well become known, if the majority's modification of Judge Murphy's decision is upheld, as the "Judges' Full Employment Bill of 1992," for unless I suffer from a cramped reading of our State Constitution, the creation of judicial offices clearly and unmistakably belongs to the General Assembly. Judge Kiley must feel enormously vindicated by the majority's action in this case, a tribute he well deserves, yet the judicial article in my copy of our State Constitution fails to provide that a single vacancy may be filled simultaneously by two persons. With all due deference and respect to my colleagues, the only conclusion I can reach in attempting to comprehend the "equitable relief" they award in this case is to attribute it to the infectious virulence of the current presidential election campaign where the core issue is the national unemployment problem; but, like the monk who would eat steak only after baptizing it "cod," the majority renames its attempt at legislation "equitable relief."