(No. 74613.—

SUSAN J. McDUNN, Petitioner, v. JAMES H. WIL-
LIAMS *et al.*, Respondents.

*Opinion filed August 26, 1993.—Rehearing
denied October 4, 1993.*

MILLER, C.J., joined by BILANDIC, J., specially concurring.
HEIPLE and FREEMAN, JJ., dissenting.

Michael E. Lavelle, of Lavelle, Juneau & McCollom, Ltd., of Oak Park (Kevin E. Bry, of counsel), for petitioner.

William J. Harte, Ltd., and Richard Flowers, both of Chicago (Joseph E. Tighe and Courtney C. Nottage, of counsel), for respondents.

Rosalyn B. Kaplan, Solicitor General, of Chicago, for

intervenor Roland W. Burris, Attorney General of the State of Illinois.

JUSTICE NICKELS delivered the opinion of the court:

Petitioner, Susan J. McDunn (McDunn), filed an election contest in the circuit court of Cook County pursuant to section 7—63 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 7—63) to challenge the results of the March 20, 1990, Democratic primary election to fill the vacant circuit court position created by the resignation of Judge Roger J. Kiley, Jr. Respondent, James H. Williams (Williams), had been declared the winner of the 1990 Democratic primary election, and was placed on the November 6, 1990, general election ballot to fill Kiley's vacancy. No other candidate ran for Kiley's vacancy in the 1990 general election. McDunn's contest of the primary election was not resolved until March 23, 1992, during which time the 1990 general election was held. Due to the pending election contest, the trial court suppressed the results of the 1990 general election to fill Kiley's vacancy. McDunn was eventually declared the winner of the 1990 primary, and the trial court ordered that she run in the 1992 general election to fill Kiley's vacancy. Williams appealed. The appellate court affirmed the trial court's order finding McDunn to be the winner of the 1990 primary, but further ordered that Williams continue to serve as a circuit court judge. (247 Ill. App. 3d 935.) Neither party appealed the appellate court's decision, and the November 3, 1992, general election was held with McDunn's running unopposed to fill Kiley's vacancy. On November 18, 1992, this court, asserting its supervisory authority (Ill. Const. 1970, art. VI, §16), ordered the case docketed in the supreme court as a matter of great importance. The August 27, 1992, order of the appellate court was recalled, and the trial court's or-

der was stayed, until further order of this court. The Attorney General was allowed to intervene.

## BACKGROUND

### The 1990 Primary

McDunn and Williams were two of six candidates who ran in the March 20, 1990, primary election to become the Democratic Party's candidate for the office of judge of the circuit court, Cook County Judicial District (within the City of Chicago), created by the resignation of Judge Roger J. Kiley, Jr. Williams had previously been appointed on June 28, 1989, by this court to occupy Kiley's vacancy until the vacancy was filled for a term. (See Ill. Const. 1970, art. VI, §12(c).) On March 27, 1990, the Chicago board of elections announced that Williams had received the highest vote total out of all the Democratic candidates for Kiley's vacancy. On April 9, 1990, the State Board of Elections certified that Williams had been nominated by the Democratic Party as its candidate for the vacant judicial position, having received 106,229 votes. The State Board of Elections certified that McDunn received the second highest number of votes with 106,049.

### McDunn's Petition

On April 19, 1990, McDunn filed a "Verified Petition to Contest Election" in the circuit court of Cook County pursuant to section 7–63 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 7–63). McDunn based her petition on a discovery recount of 25% of the precincts, which she had previously filed with the Chicago board of elections on April 2, 1990, pursuant to section 22–9.1 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 22–9.1). McDunn's petition alleged that the discovery recount revealed incorrect totals for both her and Wil-

liams, and that corrected vote totals would reveal she received the majority of votes cast in the 1990 primary.

On April 27, 1990, McDunn filed an amended "Petition For Election Contest, Complaint for Declaratory Judgment, and Injunctive Relief and Damages." In this petition, McDunn realleged her initial complaint in count I, and further asked in count II that the court enjoin the State Board of Elections from certifying the names of candidates until the Cook County canvassing board certified corrected vote totals to the State Board. The trial court allowed petitioner to file this amended complaint *instanter* on April 27, 1990.

### Williams' Motion to Dismiss

On May 16, 1990, Williams filed a motion to dismiss McDunn's petition. The motion alleged, *inter alia*, that petitioner's election contest was not timely filed. The trial court agreed with Williams, and on June 29, 1990, dismissed McDunn's entire petition.

On July 26, 1990, after filing a motion for a direct appeal to this court, which was denied, McDunn filed an appeal with the appellate court and requested an expedited schedule for disposition. The appellate court reversed the trial court's dismissal of McDunn's petition on September 28, 1990. The appellate court's mandate was stayed, however, while Williams filed a petition for leave to appeal with this court. This court denied Williams' petition for leave to appeal, and McDunn's case was reinstated on October 30, 1990. *McDunn v. Williams* (1990), 204 Ill. App. 3d 332.

### McDunn's Case and the November 1990 General Election

On October 31, 1990, the trial court denied another motion by Williams to dismiss McDunn's petition, and set a trial date of November 2, 1990, at which time Mc-

Dunn would present her evidence to show that a recount was necessary. The trial court ordered Williams to present his evidence no later than November 5, 1990.

McDunn concluded her evidence on November 5, 1990, and Williams moved for a directed finding against her. The court denied Williams' motion and found that petitioner had established a "reasonable likelihood the recount will change the results of the election." Williams then called a witness, but asked for a continuance to conclude his presentation of evidence. The trial court continued the matter over McDunn's objection until November 19, 1990. However, the trial court, concerned about the possibility that the November 6, 1990, general election could make McDunn's contest moot, and after a discussion with the parties, entered the following order:

> "The election to fill the vacancy of Roger Kiley shall proceed. The results of the election shall be suppressed by the CBEC [Chicago Board of Elections Commission] until further order of court. The suppression shall enjoin the CBEC from preparing an abstract to be forwarded to any party or government agency without order of court. The CBEC may tabulate the results during the counting period, on election night, but shall not issue any announcement as to a winner until further order of court."

The November 6, 1990, general election to fill Kiley's vacancy was held with Williams' running unopposed, but the results were suppressed pursuant to the trial court's order. No announcement was made concerning the result of the election.

On November 30, 1990, Williams filed an emergency motion in the appellate court to stay the trial court's November 5, 1990, injunction. This motion was denied on December 3, 1990, the same day Williams attended the swearing-in ceremony for newly elected judges and executed an oath of office.

McDunn's election contest resumed on December 7, 1990, and the trial court, after hearing arguments and motions, agreed with McDunn that there existed "a reasonable likelihood of success that a recount of the ballots cast *** will change the results of the election." The court ordered the recount to begin on January 3, 1991.

## The Recount and Parties' Stipulation

The recount was held, and all evidence, including a stipulation regarding undisputed facts, was filed in court on November 26 and 27, 1991. The stipulation provided that the total counted ballots in the recount for McDunn was 106,274, and the total for Williams was 106,473. However, the parties further stipulated that the recount included 1,153 uninitialled ballots for McDunn, and 1,519 uninitialled ballots for Williams. These uninitialled ballots were not marked "Defective" by election judges and had been included in the original count after the 1990 primary. (It apparently is unknown how many uninitialled ballots were marked "Defective" by election judges and never counted.) The figures for each party, without the uninitialled ballots not marked "Defective," was 105,121 votes cast for McDunn, and 104,954 for Williams. Both McDunn and Williams waived any objections to ballots for any reasons other than being uninitialled.

The parties' stipulation also noted that ballots for eight precincts could not be located. The precinct report listed the votes from the eight precincts as 279 for McDunn, and 302 for Williams. Williams denied that these totals from the precinct report could be admitted as proof of the actual valid vote cast in the missing precincts.

The stipulation further provided: "There are no allegations of fraud pending before this court." Although McDunn had alleged fraud in her complaint, the trial

court had dismissed the allegation because McDunn could not support the claim with evidence.

### The Trial Court's Order

On March 23, 1992, the trial court issued its ruling on the matter. The court held that the uninitialled ballots could not be counted under the Election Code, and upon recount, McDunn had won the 1990 primary. The court noted there was no way to determine which of the uninitialled ballots at issue had been cast absentee and which had been cast in-precinct. The court then ordered McDunn's name placed on the November 3, 1992, general election ballot to fill the judicial vacancy created by Judge Kiley's resignation. The trial court granted Williams no relief.

### The Appellate Court's Opinion

Williams filed notice of appeal on March 31, 1992. Oral argument was held on August 27, 1992, and the appellate court issued its order the same day affirming the trial court's March 23, 1992, order. The appellate court specifically found that McDunn had won the primary and ordered her name placed on the November 3, 1992, general election ballot as the Democratic Party candidate to fill the vacancy created by Kiley's resignation. However, the appellate court also ordered Williams to "continue to serve in the office of Judge of the Circuit Court of Cook County until his resignation, retirement or failure to be retained." The appellate court issued a formal opinion on September 30, 1992 (247 Ill. App. 3d 935).

### The 1992 General Election and This Court's Order

McDunn's name was placed on the November 3, 1992, general election ballot, and the election was held. McDunn, running unopposed, was certified as elected to fill Kiley's vacancy. On November 18, 1992, however, this

court entered an order in the exercise of its supervisory authority recalling the August 27, 1992, mandate of the appellate court and staying the enforcement of the March 23, 1992, judgment of the circuit court. (Ill. Const. 1970, art. VI, §16.) This order stated that the case was of such importance that it should be decided by the supreme court. The Attorney General was allowed to intervene without further leave of court to discuss the constitutional aspects of the case. This court later entered an order on November 23, 1992, recalling and assigning Williams to duty in the circuit court of Cook County *nunc pro tunc* December 3, 1990, until May 31, 1993.

Additional facts will be presented where relevant to our discussion of the issues.

We now determine who may lay rightful claim to Kiley's vacancy. The resolution of this matter requires that we address the following: (1) whether the appellate court's August 27, 1992, order was constitutional in allowing both McDunn and Williams to fill one judicial vacancy; (2) which candidate won the 1990 primary (which requires us to determine whether uninitialled ballots not marked "Defective" can be counted); (3) whether a proper recount can be conducted when ballots for eight precincts are missing; (4) whether McDunn could have properly been placed on the 1992 general election ballot if she won the 1990 primary election; (5) whether the issue of who won the 1990 primary election is moot because the 1990 general election took place with Williams' name on the ballot; (6) whether the voters' right of suffrage would be infringed if Williams should not be allowed to continue to serve as a circuit court judge; (7) whether the doctrine of *laches* would prevent McDunn from prevailing in her election contest; and (8) whether McDunn's amended petition for election contest was timely filed. We conclude that: the appellate court's or-

der was unconstitutional and cannot stand; McDunn won the 1990 primary election; a proper recount was conducted; McDunn could properly be placed on the 1992 general election ballot; the election contest is not moot; the voters' right of suffrage was not infringed; the doctrine of *laches* does not apply in this case; and we need not address the issue of whether McDunn's amended petition was timely filed. Accordingly, we vacate the judgment of the appellate court and affirm the judgment of the trial court. We declare McDunn the person duly elected to fill Kiley's vacancy.

## ANALYSIS

## I

## This Court's Jurisdiction

Before discussing the issues in this case, we first address McDunn's contention that: (1) this court is without jurisdiction to hear this matter; (2) this court should not hear the matter even if it has jurisdiction; and (3) our decision should be limited to determining only whether the appellate court's order was unconstitutional. We disagree.

### *Jurisdiction Under Our Supervisory Authority*

McDunn finds this court to be without jurisdiction because the appellate court's order was final and entered well before this court's November 18, 1992, intervention and order. Moreover, McDunn contends that the litigation was terminated and the parties relied on the results. McDunn also notes that the case did not arrive at this court by any initiation of the parties or by way of the court's rules governing appeals. While this court's order stated that it was reviewing the case under its supervisory authority, McDunn suggests that such authority is not a proper means by which jurisdiction may be ac-

quired. McDunn concludes that this court's "unprecedented grasp of this case is an action beyond its authority," and "[a]n awesome and dangerous precedent is being set, *** one which is not condoned by due process requirements of the Federal constitution, which require that parties do or perform some act or be in some position where they can reasonably be expected to be haled into court."

We initially note that McDunn's argument is not supported by any citation of authority, other than general references to our supreme court rules and Federal due process concerns. While normally this court will not entertain an argument without citation of authority (see 134 Ill. 2d R. 341(e)(7)), " 'it is the province of the court to determine for itself whether the particular case is one within its jurisdiction.' [Citations.]" (*In re Contest of the Election for the Offices of Governor & Lieutenant Governor* (1983), 93 Ill. 2d 463, 474.) We find that McDunn's argument misconstrues the nature of our supervisory authority, and conclude that this court does have jurisdiction to hear this matter under its supervisory authority.

Article VI, section 4, of the Illinois Constitution provides this court with two types of jurisdiction, original and appellate. (Ill. Const. 1970, art. VI, §4.) These grants of jurisdiction found in section 4, however, are not exhaustive, as section 16 of the judicial article grants this court general administrative and supervisory authority over all courts. Ill. Const. 1970, art. VI, §16.

The term "supervisory authority" was added to the Illinois Constitution of 1970 to:

"emphasize[ ] the importance of the general administrative authority of the Supreme Court over the Illinois court system. [It was] intended to strengthen the concept of central supervision of the judicial system." (Ill. Ann. Stat., 1970 Const., art. VI, §16, Constitutional Commentary, at 527 (Smith-Hurd 1989).)

The addition of the term "supervisory authority" was meant to clarify "that the general authority over all courts vested in the Supreme Court covers *both* administrative and supervisory powers." (Emphasis added.) 6 Record of Proceedings, Sixth Illinois Constitutional Convention 814.

A supreme court's supervisory authority is a well-known judicial power and has been thoroughly discussed in decisions outside our jurisdiction. One decision has noted that the supervisory authority:

> " 'practically places the Supreme Court in the same relation to the inferior courts of the state as the Court of King's Bench bore to the inferior courts of England, under the common law.'
>
> \*\*\*
>
> The extent of jurisdiction of the Court of King's Bench is given by Blackstone, as follows:
>
> 'The jurisdiction of this court is very high and transcendant. *It keeps all inferior courts within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below.* \*\*\* 3 Blackstone, Comm. 42.' " (Emphasis added.) *State ex rel. Freeling v. Kight* (Okla. 1915), 152 P. 362, 364.

Another authority has described the supervisory authority as follows:

> " '[It is] an extraordinary power. It is hampered by no specific rules or means for its exercise. It is so general and comprehensive that its complete and full extent and use have practically hitherto not been fully and completely known and exemplified. It is unlimited, being bounded only by the exigencies which call for its exercise. As new instances of these occur, it will be found able to cope with them. Moreover, if required, the tribunals having authority to exercise it will, by virtue of it, possess the power to invent, frame, and formulate new and additional means, writs, and processes whereby it may be exerted. This power is not limited by forms of procedure or by the writ used for its exercise. Furthermore, *it is di-*

rected *primarily to inferior tribunals, and its relation to litigants is only incidental.*' " (Emphasis added.) *In re Huff* (1958), 352 Mich. 402, 417-18, 91 N.W.2d 613, 620, quoting 14 Am. Jur. *Courts* §265 (1938).

We conclude here by finding, as has another court, that our supervisory authority:

> "is a grant of power. It is unlimited in extent. It is undefined in character. It is unsupplied with means and instrumentalities. The constitution leaves us wholly in the dark as to the means of exercising this clear, unequivocal grant of power. *It gives, indeed, the jurisdiction, but does not pretend to intimate its instruments or agencies.*" (Emphasis added.) (*Attorney General v. Blossom* (1853), 1 Wis. 317, 325.)

Thus, our supervisory authority gives this court jurisdiction to hear this matter.

McDunn's contention that the litigation was terminated upon the appellate court's order, and that no parties or controversy were before this court, overlooks the serious nature of the appellate court's order and the possible harm it may bring to our judicial system if left unsupervised. The appellate court's order raises serious questions concerning Williams' and McDunn's jurisdiction to hear cases. Any party appearing before McDunn or Williams, including criminal defendants, could argue that the court's decision was entered without jurisdiction. In the case of a criminal conviction, a double jeopardy argument may also be advanced. It is this court's responsibility pursuant to our supervisory authority to prevent such an occurrence.

Moreover, our appellate court must not be allowed to fashion unconstitutional remedies with possibly harmful consequences that escape review merely because all parties are pleased with the outcome. Such a result would lead to public contempt for, and ridicule of, our court

system, as well as nullify our mandate under the constitution to supervise our court system.

The fact that neither party appealed this case does not affect our jurisdiction. A patent anomaly would exist if this court, granted supervisory authority over all courts by our constitution, could then not implement that authority, no matter what impact a court's order might have on our court system, merely because the parties involved were pleased with the court's order. The supervisory authority is primarily directed to the court and its decision, and thus the parties are only involved incidentally. Moreover, McDunn did not file a special appearance to contest *in personam* jurisdiction and has thus waived any alleged irregularity in this proceeding by appearing and arguing the matter to this court. Ill. Rev. Stat. 1989, ch. 110, par. 2—301.

### *Misuse of Supervisory Authority*

McDunn also argues that if this court has jurisdiction to hear this case, it is a misuse of that jurisdiction, for our supervisory authority should be used only with restraint and when appropriate. McDunn notes that this court has used its supervisory authority in the past when trial courts were not acting within their jurisdiction (*People v. Williams* (1988), 124 Ill. 2d 300; *Doherty v. Caisley* (1984), 104 Ill. 2d 72; *People v. Breen* (1976), 62 Ill. 2d 323), where cases were not necessarily appealable, but compelling reasons existed for review (*Crane Paper Stock Co. v. Chicago & Northwestern Ry. Co.* (1976), 63 Ill. 2d 61) and to answer recurring discovery questions in criminal cases (*People ex rel. Carey v. Strayhorn* (1975), 61 Ill. 2d 85). McDunn finds a common factual situation in these cases that is absent from the present case: a party called upon the court to use its power to "remedy oft-recurring misuses of judicial power, or was asked by a party to resolve important recurring ques-

tions relating to tension between legislative fiat and supreme court rule."

As just noted, however, this court's supervisory authority is not limited by any rules or means for its exercise. It is " 'bounded only by the exigencies which call for its exercise[ and as] new instances of these occur, it will be found able to cope with them.' " (*In re Huff*, 352 Mich. at 418, 91 N.W.2d at 613, quoting 14 Am. Jur. *Courts* §265 (1938).) We find it hard to imagine a more important case than this to invoke our supervisory authority, where the appellate court has fashioned an order that McDunn acknowledges is unconstitutional and, if so, would have a major impact on our court system. Moreover, as also just noted, the fact that no party has called upon this court to hear this matter does not affect our jurisdiction under our supervisory authority.

McDunn also argues that it would be a misuse of our supervisory authority to hear this matter because this court has already given its imprimatur to the appellate court's 1992 decision. McDunn believes this happened when this court denied Williams' petition for leave to appeal the appellate court's 1990 decision finding McDunn's election contest timely filed. (*McDunn v. Williams* (1990), 204 Ill. App. 3d 332, *appeal denied* (1990), 135 Ill. 2d 558.) However, this court's denial of Williams' 1990 petition for leave to appeal is in no way relevant to the appellate court's 1992 order allowing both Williams and McDunn to fill one judicial vacancy.

## Limitation On Our Review

McDunn next attempts to limit our review of the matter by arguing that even if this court's exercise of supervisory authority is proper, review should extend only to the remedy fashioned for Williams by the appellate court, that is, allowing Williams to continue to serve as circuit judge. McDunn further argues that Williams

has waived any substantive issues for review because he failed to appeal the appellate court's decision. We do not limit our discussion of this case. It would be unfair for Williams not to be able to present substantive argument here after receiving all the relief he requested at the appellate level. Moreover, the appellate court's opinion is susceptible to the interpretation, and Williams in fact argues, that the appellate court fashioned a remedy for McDunn, not Williams.

## II

### Constitutionality of Appellate Court's Decision

We now address the constitutionality of the appellate court's decision, which essentially allowed both Williams and McDunn to fill a single judicial vacancy. We agree with the Attorney General that the appellate court's order is unconstitutional for the following reasons: (1) it increases the number of judges in Cook County; (2) it usurps this court's power to appoint persons to fill judicial vacancies, if viewed as an appointment; (3) it fails to place the proper constitutional limitations concerning judges on Williams, if viewed as an appointment; and (4) because it was made with no legislative appropriation of State funds.

The judgment of the appellate court, delivered by Justice Tully, found that McDunn had, under "a strict application of the election rules," won the primary. However, the court went on to find that Williams had in fact received more votes in the 1990 primary, was on the 1990 general ballot, and was elected by the voters of Cook County, who believed him to be the valid Democratic nominee to fill Kiley's position. Relying on section 7—63 of the Election Code and Supreme Court Rule 366(a)(5), the court thus "fashion[ed] a remedy in the interests of fairness and equity." (Ill. Rev. Stat. 1989, ch.

46, par. 7—63; 134 Ill. 2d R. 366(a)(5).) In order to "insure the integrity of the election process [as well as] *** guarantee the individual and constitutional rights of the electorate," the court ordered:

"Williams shall continue to serve in the office of judge of the circuit court of Cook County until his resignation, retirement or failure to be retained, *** [and] Susan J. McDunn's name [shall be simultaneously placed] on the November 3, 1992, general election ballot to fill the judicial vacancy of the Honorable Roger J. Kiley, Jr." 247 Ill. App. 3d at 947.

The two other justices each concurred in part and dissented in part from the majority opinion. Justice Greiman joined in that part of the decision granting relief for Williams, but dissented from that part of the opinion affirming the trial court with regard to McDunn. Justice Greiman based this decision on his finding that the parties had stipulated there was no fraud present or alleged, and that the parties had acted in good faith in resolving their dispute. Justice Greiman concluded that McDunn's election contest was moot because it had not been resolved prior to the general election.

The third justice, Justice Scariano, agreed with the majority opinion as far as affirming the trial court and having McDunn placed on the 1992 general election ballot to fill Kiley's vacancy. However, Justice Scariano dissented from that part of the opinion allowing Williams to continue to serve as a circuit judge. Justice Scariano believed that allowing both judges to fill the one judicial vacancy would violate our constitution.

The Illinois Constitution of 1970 grants the General Assembly the power to provide by law, with certain minimum requirements, the number of circuit judges to serve in each circuit court. (Ill. Const. 1970, art. VI, §7(b).) Pursuant to this grant of power, the General Assembly has specified the number of authorized circuit

court judges in the Circuit Courts Act (Ill. Rev. Stat. 1989, ch. 37, par. 72.01 *et seq.*). The appellate court's order, in effect, has created an additional circuit court judicial position for Cook County, an act exclusively within the province of the legislature pursuant to our constitution. Not only does this violate the clear language of article VI, section 7, of our constitution and the Circuit Courts Act enacted thereunder, it also violates the separation of powers established in article II, section 1, of our constitution, as the appellate court's order infringes upon exclusively legislative power. Ill. Const. 1970, art. II, §1.

We also note that our constitution provides that the General Assembly may provide by law the procedure to fill judicial vacancies. In the absence of such a law, our constitution states that this court shall have such authority. (Ill. Const. 1970, art. VI, §12(c).) The General Assembly has deferred by statute to this court for the filling of certain judicial vacancies. Ill. Rev. Stat. 1989, ch. 37, par. 72.42.

As the Attorney General notes in his brief, the appellate court's order may be interpreted as an appointment of Williams to an inevitable opening for a circuit court position in Cook County. However, this power has been granted by our constitution to the legislature, which has deferred the matter to this court. The appellate court's order, then, if viewed as an appointment, usurps this court's authority to make appointments to judicial vacancies in violation of the constitution and the legislative enactment deferring such duty to this court.

Moreover, if interpreted as an appointment, the appellate court's order is further unconstitutional, as it provided only that Williams serve "until his resignation, retirement or failure to be retained." (247 Ill. App. 3d at 947.) Our constitution provides more restrictions on a person appointed to fill a judicial vacancy, including one

of time: "A person appointed to fill a vacancy *** shall serve until the vacancy is filled for a term at the next [applicable] election." (Ill. Const. 1970, art. VI, §12(c).) Our constitution also places a behavior restriction on judges, as any judge may be removed from office by the Illinois Courts Commission for "willful misconduct in office, persistent failure to perform his duties, or other conduct that is prejudicial to the administration of justice or that brings the judicial office into disrepute." Ill. Const. 1970, art. VI, §15(e); see also Ill. Const. 1970, art. VI, §13.

We further note that our constitution authorizes only the General Assembly to appropriate for the State expenditure of funds. (Ill. Const. 1970, art. VIII, §2(b).) Thus, without the legislative creation of an additional circuit court position, or notice to this court of a vacancy, there will be no source of appropriated State funds available to pay both Williams and McDunn. In fact, any attempt by the Comptroller to pay a position not appropriated by the legislature would raise serious separation of powers problems. See *Board of Trustees of Community College District No. 508 v. Burris* (1987), 118 Ill. 2d 465; *American Federation of State, County & Municipal Employees v. Netsch* (1991), 216 Ill. App. 3d 566.

Williams argues, however, that courts may create an additional circuit court position because the constitution only provides that the number of circuit court judges shall be "provided by law." (Ill. Const. 1970, art. VI, §7(b).) Williams argues that the constitution does not specify that the "law" must be an enactment by the legislature detailing the number of circuit court judges. Instead, Williams suggests, the "law" in this instance is section 7—63 of the Election Code, which allows courts to hear and determine primary election contests and

"make such orders and enter such judgment as justice may require." Ill. Rev. Stat. 1989, ch. 46, par. 7—63.

The appellate court did base its order on section 7—63 of the Election Code, as well as Supreme Court Rule 366(a)(5), which allows the appellate court to "grant any relief *** that the case may require." (Ill. Rev. Stat. 1989, ch. 46, par. 7—63; 134 Ill. 2d R. 366(a)(5).) However, nothing in section 7—63 suggests that the legislature intended to allow the appellate court to increase the number of circuit court positions in direct contravention of the Circuit Courts Act (Ill. Rev. Stat. 1989, ch. 37, par. 72.01 *et seq.*). Moreover, specific statutory provisions generally control over general provisions on the same subject. (*Williams v. Illinois State Scholarship Comm'n* (1990), 139 Ill. 2d 24.) We also note that nothing in our Rule 366 suggests such a result. As the Attorney General argues, such an interpretation would allow courts to create an unlimited number of political offices in the name of equity and justice. "Courts are bound to presume that absurd consequences were not contemplated by the legislature ***." (*Illinois Chiropractic Society v. Giello* (1960), 18 Ill. 2d 306, 312.) Moreover, "[t]he equitable powers of a court may not be exercised to direct a remedy in contradiction to the plain requirements of a statute." (*601 West 81st Street Corp. v. City of Chicago* (1984), 129 Ill. App. 3d 410, 418.) Such an interpretation also ignores the fact that the legislature must appropriate the necessary funds for any new position.

We conclude this discussion by noting that the appellate court's order is also troublesome because the court based its decision for McDunn on the law as to uninitialled ballots, but then granted relief to Williams, in part, by ignoring that same law. After finding McDunn won the 1990 primary because uninitialled ballots could not be counted under the Election Code, the appellate

court then ordered relief for Williams, stating: "[W]e cannot ignore the fact that Williams actually received a larger number of votes than McDunn [in the 1990 primary]." (247 Ill. App. 3d at 946.) If such were the case, there could be more than one primary winner in every instance where uninitialled ballots were a factor.

### III

### Uninitialled Ballots

Having found the appellate court's order unconstitutional, we must now determine whether McDunn or Williams is entitled to fill the judicial vacancy created by Kiley's resignation. We begin by determining who won the 1990 primary election to fill Kiley's vacancy. If the uninitialled ballots at issue here are included in the count, Williams is stipulated to have received the highest number of votes. However, if the uninitialled ballots are not included in the count, then McDunn is stipulated to have received the most votes. We find the uninitialled ballots at issue cannot be counted under the Election Code, and that McDunn thus won the 1990 primary election.

The Election Code provides that ballots uninitialled by judges of election shall not be counted. Section 7—44 of the Election Code provides that at primaries, judges of election shall give qualified voters a ballot upon which the judge has endorsed his initials. (Ill. Rev. Stat. 1989, ch. 46, par. 7—44.) Section 24A—10.1 of the Election Code provides:

> "The judges of election shall *** examine all ballot cards and ballot card envelopes which are in the ballot box to determine whether the ballot cards and ballot card envelopes contain the initials of a precinct judge of election. If any ballot card or ballot card envelope is *not initialed*, it shall be marked on the back 'Defective', initialed as to such label by all judges immediately under the word 'De-

fective' and *not counted.*" (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 46, par. 24A—10.1.)

Finally, section 7—51 of the Election Code provides: "No primary ballot, without the endorsement of the judge's initials thereon, shall be counted." Ill. Rev. Stat. 1989, ch. 46, par. 7—51.

This court has long adhered to the rule that statutes requiring election judges to initial ballots are mandatory, and that uninitialled ballots may not be counted. (*Morandi v. Heiman* (1961), 23 Ill. 2d 365; *Griffin v. Rausa* (1954), 2 Ill. 2d 421; *Tuthill v. Rendelman* (1944), 387 Ill. 321.) However, in *Craig v. Peterson* (1968), 39 Ill. 2d 191, this court found an exception to that rule. *Craig* involved the issue of whether uninitialled absentee ballots could be counted in an election where none of the absentee ballots cast in 14 precincts were initialled as required by the Election Code. Under the statute in *Craig*, election judges were to initial absentee ballots after receiving them from the absentee voters, and then place them in the ballot box on the day of election. (Ill. Rev. Stat. 1965, ch. 46, par. 19—9.) The absentee ballots in *Craig* could be separated from the votes cast in-precinct because the only paper ballots used in the election were absentee ballots. The parties involved in the dispute stipulated that the ballots in question were the same ballots delivered by the county clerk's office to the absentee voters, and that no question of fraud or tampering was presented.

In addressing the issue of uninitialled ballots, this court noted in *Craig* that it was being asked for the first time to directly determine whether the initialling requirement of the Election Code was constitutional. This court initially noted that a statute which deprives a fully qualified voter of his right to vote, absent any fault of his own, is constitutionally suspect. (*Craig*, 39 Ill. 2d at 196.) Absentee voters in *Craig* would have been de-

prived of the right to vote without any fault of their own if their votes were not counted because they could not have determined whether election judges had initialled their ballots before the judges placed them in the ballot box.

Next, this court noted that statutes which do not contribute substantially to the integrity of the election process are usually held directory. (*Craig*, 39 Ill. 2d at 196.) After reviewing the facts of the case, this court found the initialling requirement as applied to the absentee ballots in *Craig* did not contribute to the integrity of the election process for two reasons: (1) the parties stipulated that the ballots in question were the same ballots sent from the county clerk's office to the absentee voters, and no claim was made that the ballots were tampered with, altered, or in any way improperly preserved; and (2) the absentee ballots could be identified because they were the only paper ballots used in the election.

This court went on to note, however, that the initialling requirement in the Election Code was still mandatory for ballots cast in-precinct:

> "The statute requires the ballots to be initialled, it commands that no unindorsed ballot shall be counted, this requirement substantially contributes to the integrity of the election process and is a valid, mandatory provision which the courts must enforce." (*Craig*, 39 Ill. 2d at 198.)

Moreover, in an instance where uninitialled absentee ballots could not be separated from the in-precinct ballots, this court stated:

> "[T]here must *** in order to prevent fraud, be some method whereby illegally cast ballots may be distinguished and rejected. The initialling provision is the principal method chosen by the legislature for accomplishing this purpose since the judge who has indorsed his initials upon the ballot can thereafter identify that ballot as legally cast. Because of the compelling importance to the public that elections be honestly conducted, and the sub-

stantial contribution of the initialling procedure to that result, no constitutional problem arises and courts are free to enforce the statutory command even though absentee voters may be disenfranchised without fault on their part (one who votes at the polls has the opportunity to see whether the judge of election has initialled his ballot and request it to be done if it has not)." *Craig*, 39 Ill. 2d at 200-01.

Thus, this court in *Craig* found an exception to the otherwise mandatory initialling requirement under the following circumstances: (1) a voter will lose his right of suffrage without any fault of his own; and (2) the requirement does not contribute substantially to the integrity of the election.

This court more recently addressed the issue of uninitialled ballots in *Pullen v. Mulligan* (1990), 138 Ill. 2d 21, which also involved the issue of uninitialled absentee ballots. As in *Craig*, the absentee ballots in *Pullen* could be separated from the in-precinct ballots cast, and the parties stipulated that the uninitialled absentee ballots had been properly preserved from the election night.

This court reiterated in *Pullen* that the statutory requirement that ballots be initialled by election judges before placing them in the box is mandatory. (*Pullen*, 138 Ill. 2d at 49.) However, noting the decision in *Craig*, this court found that the uninitialled absentee ballots in *Pullen* could be counted. This court explained:

"Because absentee ballots are not cast in the polling place, and are not opened until after the polls have closed, application of the initialling requirement to such ballots is not necessary to prevent voters from fraudulently stuffing the ballot box. Here, as in *Craig*, neither party questioned the legitimacy of the uninitialled absentee ballots or alleged any fraud or other irregularity. Accordingly, under the reasoning adopted in *Craig*, application of the initialling requirement is not necessary to

preserve the integrity of the election process." (*Pullen*, 138 Ill. 2d at 53.)

However:

"Applying the initialling requirement to *in-precinct* ballots is certainly necessary to preserve the integrity of the election, because the initials provide the only means by which the election officials can identify and separate the legally cast from the illegally cast in-precinct ballots. Thus, here, as in *Craig*, application of the initialling requirement to in-precinct ballots prevented fraudulent practices, such as stuffing the ballot box." (Emphasis in original.) *Pullen*, 138 Ill. 2d at 53.

Applying the reasoning in these two cases to the instant case, we note that the statutes requiring initialling are not constitutionally suspect. Voters who cast a ballot in-precinct will not lose the right to vote without fault of their own because such voters could tell whether the election judges had initialled their ballots. Any voter at the precinct with an uninitialled ballot could ask the election judge to initial his ballot and thus ensure that his vote would be counted.

Next, we find the mandatory initialling requirement did add significantly to the integrity of the election. Here, unlike the instance where only absentee ballots are involved, the mandatory initialling requirement allows election judges to determine those ballots which were properly placed in the ballot box. Our legislature has specifically chosen this method to preserve the integrity of the election.

We further note that it is not known if any of the absentee ballots were uninitialled in this case, because such ballots could not be separated from the ballots cast in-precinct. However, as this court noted in *Craig*, no constitutional problem arises by not counting such votes, if they even exist here, because of the substantial contribu-

tion the initialling requirement brings to the election. *Craig*, 39 Ill. 2d at 201.

Williams argues, however, that the ballots should be counted because the initialling requirement is directory under the facts of this case. In the alternative, Williams believes, the initialling requirement should be held void for denying voters' suffrage rights. Williams relies on two cases from different jurisdictions (*Ollman v. Kowalewski* (1941), 238 Wis. 574, 300 N.W. 183; *Moyer v. Van De Vanter* (1895), 12 Wash. 377, 41 P. 60) and two assertions: (1) the initialled ballots were legally cast and are only uninitialled due to "innocent mistake"; and (2) the parties stipulated there was no fraud.

Williams' first case, *Ollman*, held that ballots which bore the initials of two election clerks as required by law, but which were improperly endorsed because one clerk placed his own initials and those of another clerk on the ballots, should be counted. The Wisconsin court stated:

> "[N]ot to count [the voter's] vote *for no fault of his own* would deprive him of his constitutional right to vote. Any statute that purported to authorize refusal to count ballots cast under the instant circumstance would be unconstitutional. A statute purporting so to operate would be void, rather than the ballots. And the ballots not being void, should be counted notwithstanding the statute." (Emphasis added.) (*Ollman*, 238 Wis. at 578, 300 N.W. at 185.)

Williams argues the same reasoning applies to the facts of this case.

*Ollman*, however, is factually distinguishable from the instant case, for here, no initials whatsoever appeared on the ballots. In *Ollman*, a voter could not determine if each clerk had signed his own initials on the ballot, and through "no fault of his own," would lose his right to vote if the ballots were not counted. (*Ollman*, 238 Wis.

at 578, 300 N.W. at 185.) Here, a voter receiving a ballot in-precinct which lacked election judge's initials could ensure that his vote was counted by asking the election judge to initial the ballot.

Moreover, the *Ollman* decision was explained in a more recent decision by the Wisconsin Supreme Court which held that uninitialled absentee ballots could not be counted. (*Gradinjan v. Boho* (1966), 29 Wis. 2d 674, 139 N.W.2d 557.) In *Gradinjan*, the Wisconsin Supreme Court distinguished *Ollman* on two grounds: (1) in *Ollman*, the voter received a ballot with the initials of two election judges marked upon it at a regular polling place and had no way of determining if each judge had endorsed his own initials; and (2) *Gradinjan* involved absentee ballots which the legislature could have believed were more susceptible to fraud than ballots cast in-precinct. The court concluded:

> " 'While the right of the citizen to vote in elections for public officers is inherent, it is a right nevertheless subject to reasonable regulation by the legislature. [Citations.]
> \*\*\* [T]he legislature has the constitutional power to say how, when and where his ballot shall be cast \*\*.' "
> *Gradinjan*, 29 Wis. 2d at 684-85, 139 N.W.2d at 563, quoting *State ex rel. Frederick v. Zimmerman* (1949), 254 Wis. 600, 613, 37 N.W.2d 473, 480.

Williams attempts to distinguish *Gradinjan* by arguing that in rejecting the absentee ballots, the Wisconsin Supreme Court found that absentee ballots could be more susceptible to fraud than in-precinct ballots. Thus, Williams argues, the court's concern in *Gradinjan* about the uninitialled absentee ballots is not present here where the uninitialled ballots were cast in-precinct. However, this court has found that under our voting system, absentee voting is less susceptible to fraud and ballot stuffing than voting in-precinct. (*Pullen*, 138 Ill. 2d at

53.) Thus, we do not find that *Ollman* supports Williams' theory.

Moreover, while Williams' second case, *Moyer*, which allowed uninitialled ballots to be counted, does support his case, the majority of other State's decisions support our view that uninitialled ballots cannot be counted. See *Huntley v. Timm* (N.D. 1989), 435 N.W.2d 683; *Wright v. Gettinger* (Ind. 1981), 428 N.E.2d 1212; *State ex rel. Patrick v. County Court* (1969), 152 W. Va. 592, 165 S.E.2d 822 (uninitialled ballots could not be counted even where no allegations of fraud existed); *Stevens v. Coleman* (1949), 311 Ky. 313, 224 S.W.2d 149; *Hammond v. Love* (1946), 187 Md. 138, 49 A.2d 75; *Swan v. Bowker* (Neb. 1938), 281 N.W. 891 (uninitialled ballots not to be counted even in absence of no allegations of fraud).

Williams further argues that this court allowed votes to be counted in *Pullen* where ballots lacked precinct numbers, had the wrong precinct designation, and were numbered, and where applications lacked voters' signatures. Williams argues that if these votes were allowed to be counted, then uninitialled ballots should be counted as well.

This court in *Pullen* noted the following about the Election Code:

> "The Election Code is a comprehensive scheme which regulates the manner in which elections shall be carried out. Strict compliance with all applicable provisions in the Election Code is not necessary, however, to sustain a particular ballot. Rather, our courts draw a distinction between violations of 'mandatory' provisions and violations of 'directory' provisions. Failure to comply with a mandatory provision renders the affected ballots void, whereas technical violations of directory provisions do not affect the validity of the affected ballots. [Citation.]" (*Pullen*, 138 Ill. 2d at 46.)

In each of these circumstances cited by Williams, no statute prohibited such ballots from being counted. As this court further noted in *Pullen*:

"In determining whether a statute is mandatory or directory, our courts have generally regarded the language of the statute as the best indicator of legislative intent." *Pullen*, 138 Ill. 2d at 65.

This court viewed the evidence and weighed policy considerations of each of these technical defects in *Pullen*, and determined that they should not affect the ballots' validity. (See *Pullen*, 138 Ill. 2d at 55-71.) In the instant case, however, the legislature has determined that the initialling requirement is mandatory so as to ensure the integrity of the election. We have found this mandatory requirement reasonable in cases of in-precinct balloting. As noted in *Gradinjan*, the legislature may reasonably regulate how, when and where a voter may cast his ballot. *Gradinjan*, 29 Wis. 2d at 648-85, 139 N.W.2d at 563.

Williams also relies on two assertions, the first of which is that the uninitialled ballots at issue here were legally cast and only uninitialled due to innocent mistake. This assertion is faulty, however, for the legislature has created the reasonable presumption that uninitialled ballots are not legally cast, and should not be counted. Moreover, "[j]udges of election are presumed to perform the duties required of them by statute." (*In re Contest of the Election for the Offices of Governor & Lieutenant Governor* (1983), 93 Ill. 2d 463, 480, citing *Tuthill v. Rendelman* (1944), 387 Ill. 321, 332.) Thus, it must be presumed that the judges of election performed their duty and initialled the ballots, and that the uninitialled ballots were not legally cast.

While Williams argues that voters have no way of knowing this technical initialling requirement, we note that this has been the law in our State for many years.

Moreover, ballots have a box clearly marked on the front for the judge's initials. Nothing prevents a voter from learning the basics of the Election Code or questioning why the space for judge's initials on their ballots has not been endorsed.

Williams also argues that the election judges could, and in fact here did, properly determine which ballots had been legally placed in the ballot box without determining whether the ballots had been initialled by an election judge. Williams relies on the fact that the uninitialled ballots at issue were not marked "Defective" by the election judges after retrieving them from the ballot box. However, the rationale behind the initialling requirement is that election judges can only know which ballots have been legally placed inside the ballot box by examining the ballot and determining if the ballot contains the judge's initials. If an election judge's initials are not on the ballot, that judge cannot be sure that such ballot has been properly deposited in the ballot box. As this court has noted:

> "It is precisely this type of occurrence that the initialling provisions are designed to prevent. Their purpose is to permit ready identification of legal ballots cast (*Laird v. Williams*, 281 Ill. 233, 238, 239); *** to prevent the voting and counting of ballots that may have been surreptitiously obtained and copied (*Kelly v. Adams*, 183 Ill. 193); to safeguard the votes of electors (*Sibley v. Staiger*, 347 Ill. 288); to prevent frauds from being committed in elections, and to afford efficient means for detecting frauds. (*Griffin v. Rausa*, 2 Ill. 2d 421.) *The precautionary nature of initialling is such that we have held it cannot be supplied or corrected after the ballots have once been deposited in the ballot box. Talbott v. Thompson, 350 Ill. 86, 96." (Emphasis added.)* *Morandi*, 23 Ill. 2d at 374.

Williams' second assertion is that the parties have stipulated that there was no fraud in this case and, thus, there are no fraud concerns. This assertion misinterprets

the parties' stipulation, which reads: "There are no allegations of fraud pending before this Court." The stipulation clearly refers to the fact that the trial court dismissed McDunn's allegation of fraud because she did not have evidence to support the charge. McDunn did not stipulate to the absence of fraud in the election, nor did she stipulate that the uninitialled ballots were the same ballots legally given to voters by election judges who innocently forgot to initial them.

Williams also argues that McDunn makes no ballot-stuffing claims, or the like, which would tend to attack the integrity of the election process. However, the Election Code does not require that such claims be made. In fact, this court in *Morandi*, under similar facts, held that uninitialled ballots could not be counted even though the parties agreed there was no knowledge of fraud or corruption. *Morandi*, 23 Ill. 2d at 367.

We thus find that the uninitialled ballots from the March 20, 1990, primary should not have been counted. Upon recount, we find that McDunn received the highest vote total in the 1990 primary to become the Democratic nominee to fill Judge Kiley's position, receiving 105,121 votes to Williams' 104,954.

## IV

## The Missing Ballots

Williams next argues that McDunn's election contest must fail because no "full recount" was conducted. While the trial court ordered that all ballots be recounted, the ballots for eight precincts could not be located. Thus, Williams suggests, in the absence of a "full recount," no court, including this one, can determine that the "true" electoral count is different from that originally announced. We disagree.

Section 7—63 of the Election Code provides concerning recounts:

"If the grounds alleged [in the petition] are sufficient in law, the court shall proceed in a summary manner and may hear evidence, examine the returns, recount the ballots and make such orders and enter such judgment as justice may require." (Ill. Rev. Stat. 1989, ch. 46, par. 7—63.)

The law has long been:

"The returns of the election officials are *prima facie* evidence of the result of the election. The ballots, however, are the original evidence of the votes cast. In an election contest, the court may accept the ballots cast at the election as better evidence of the result than the election returns if those ballots have been properly preserved. [Citations.]" (*Pullen v. Mulligan* (1990), 138 Ill. 2d 21, 72.)

Moreover:

"Where the evidence shows that both the judges of election and the custodian of the ballots have failed properly to perform their duties, neither the returns of the judges nor the ballots will prevail over the other, but the result must be determined from a consideration of the returns and the ballots, with all the attending facts and circumstances. [Citations.]" *Talbott v. Thompson* (1932), 350 Ill. 86, 93.

In the instant case, the ballots from eight precincts could not be located. However, pursuant to section 7—63, the trial court counted the ballots that were located, accepting them as original evidence, and then determined that the returns from those eight precincts were *prima facie* evidence of the votes cast for those precincts. This was in accordance with the law, which is clear that while the ballots are original evidence, the official results are *prima facie* evidence of the votes cast. Where the original ballots cannot be deemed trustwor-

thy, or as here, are missing, the official results are the best evidence.

Williams argues, however, that unlike the cases cited, the ballots here are completely missing. Thus, Williams believes, no opportunity existed to tamper with the missing ballots, and no procedure exists to determine whether they were uninitialled or defective. The evidence in question, Williams concludes, does not reveal that the missing ballots were validly cast in McDunn's favor and, therefore, she cannot prove by a preponderance of the evidence that she received a plurality of the initialled ballots under her theory of the case.

However, the fact that the ballots for 8 out of 2,911 precincts could not be located does not mean McDunn's contest must fail. The missing ballots only affect the facts and circumstances of the recount. Moreover, while relying on uninitialled ballots, McDunn's theory of the case is that she received more votes than Williams in the primary.

Williams further relies on *Hennessy v. Porch* (1910), 247 Ill. 388, where this court held that "when the court undertakes to re-count them, all the ballots will be counted and the results declared according to their legal effect." (*Hennessy*, 247 Ill. at 390.) *Hennessy*, however, did not involve the facts present in this case, namely the eight missing precincts. Rather, *Hennessy* involved a situation where all the ballots were accounted for and thus able to be recounted.

### V

### Whether the Election Code Authorized McDunn to be Placed on the 1992 Ballot

Having determined that McDunn won the 1990 primary to fill Kiley's vacancy, we must now consider whether the Election Code authorized the trial court to

place her on the *1992* general election ballot to fill that vacancy when she had won the *1990* primary election. We conclude that the Election Code provides for the specific relief the trial court granted McDunn.

Section 2A—1.2 of the Election Code specifies the consolidated schedule of elections. (Ill. Rev. Stat. 1989, ch. 46, par. 2A—1.2.) Section 2A—1.2(b)(1) provides:

"(b)  At the general primary election:

(1) in each even-numbered year candidates of political parties shall be nominated for those offices to be filled at the general election *in that year* \*\*\*." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 46, par. 2A—1.2(b)(1).)

Moreover, section 2A—9 of the Election Code provides:

"Judges of the Supreme, Appellate and Circuit Courts shall be elected in their respective districts or circuits at the general election of each even-numbered year immediately preceding the expiration of the term of each incumbent judge, not retained, whose term expires before the next general election, and shall enter upon the duties of their offices on the first Monday of December after their election." Ill. Rev. Stat. 1989, ch. 46, par. 2A—9.

A reading of these two sections seems to provide that McDunn could not have been placed on the 1992 general election ballot to fill Kiley's vacancy because she was nominated at the 1990 primary election, and could thus have only run in the 1990 general election. However, a reading of the entire Election Code reveals otherwise.

Section 7—59(a) of the Election Code provides:

"The person receiving the highest number of votes at a primary as a candidate of a party for the nomination for an office shall be the candidate of that party for such office, and his name as such candidate shall be placed on the official ballot at the election then next ensuing \*\*\*." Ill. Rev. Stat. 1989, ch. 46, par. 7—59(a).

Section 7—63 of the Election Code, which provides for, and details the procedure of, primary election contests, states:

"If the grounds alleged are sufficient in law, the court shall proceed in a summary manner and may hear evidence, examine the returns, recount the ballots and make such orders and enter such judgment as justice may require." (Ill. Rev. Stat. 1989, ch. 46, par. 7—63.)

Moreover, and more importantly, section 2A—1(e) provides:

"(e) In the event any court of competent jurisdiction declares an election void, the court *may order another election without regard to the schedule of elections* set forth in this Article." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 46, par. 2A—1(e).

The trial court here weighed the evidence, and correctly determined that McDunn had received the highest number of votes in the 1990 primary election. After this, the trial court found the 1990 general election to fill Kiley's position had no effect because McDunn was not on the ballot as required by section 7—59, and because the trial court had suppressed the 1990 general election results to fill Kiley's vacancy. The trial court then rescheduled the election to fill Kiley's vacancy for November 3, 1992, with McDunn as the Democratic candidate. What the trial court did, although relying on the general authority found in section 7—63 of the Election Code, was to declare the 1990 general election to fill Kiley's vacancy void, and order another election "without regard to the schedule of elections set forth in [Article II]." (Ill. Rev. Stat. 1989, ch. 46, par. 2A—1(e).) Thus, the Election Code specifically provided that the trial court could place McDunn on the *1992* general election ballot to run for Kiley's vacancy, even though she had won the *1990* primary election to run for that vacancy.

## VI

### Williams' Mootness Argument

Williams next argues that the issue of who won the

primary is moot. We disagree, as did the trial and appellate courts. "An issue is moot if no actual controversy exists or where events occur which make it impossible for the court to grant effectual relief. [Citations.]" (*Wheatley v. Board of Education of Township High School District 205* (1984), 99 Ill. 2d 481, 484-85.) Due to the unique facts of this case, we find the issue is not moot for the following reasons: (1) the trial court, under time constraints, and after finding prior to the general election a reasonable likelihood that McDunn would prevail on her claim, ordered the election results suppressed; (2) the only candidate to run for Kiley's position in the general election, a seat that Williams was then occupying, was the Democratic nominee; and (3) the delay in resolving the election contest was apparently not due to any bad faith by any of the parties. We thus find that the trial court's order preserved the status quo, and effectual relief can be granted in this case.

Williams argues that the case is moot because at the time of the 1990 general election, he was the declared winner of the 1990 primary, his name was on the 1990 general election ballot, the election proceeded, votes were cast in his favor, nobody else ran in the 1990 general election for Kiley's vacancy, and he took the oath of office. Williams relies on two appellate decisions to support his claim. Williams' first case, *Harris v. Education Officers Electoral Board of Community Consolidated School District 110* (1990), 203 Ill. App. 3d 917, involved a plaintiff who sought review of an administrative decision allowing a candidate's name to be placed on the ballot for election to the school board. The trial court confirmed the administrative board's finding allowing the candidate on the ballot, and the plaintiff sought review in the appellate court. At the time the appeal was heard, however, nearly eight months had passed since the election and the candidate had been elected and taken office.

The appellate court found that under those facts, any decision on the merits would render wholly ineffective relief to the prevailing party. Thus, the appellate court found the issue moot. *Harris*, 203 Ill. App. 3d at 920.

Williams also relies on *Bartos v. Chicago Board of Elections* (1989), 191 Ill. App. 3d 937, where the plaintiff sought review of the board of election commissioners' decision denying his request to be a write-in candidate for the office of mayor of Chicago. The trial court dismissed plaintiff's attempt at review, and the appellate court found the issue moot, as both the mayoral primary and general election had taken place, and "[t]he winner of the election was proclaimed, installed as mayor, and has served as mayor since his installation." *Bartos*, 191 Ill. App. 3d at 938.

The instant case, however, is factually distinguishable from both *Harris* and *Bartos*. Here, unlike in *Harris* and *Bartos*, the trial court found prior to the general election that McDunn had established the reasonable likelihood of succeeding on the merits of her contest. After finding this, the trial court granted, over McDunn's objection, Williams' motion for a continuance until after the election. Then, again over McDunn's objection, the trial court ordered that the election proceed, but ordered the results of the election suppressed until further order of court. The trial court later explained its actions in its March 23, 1992, order:

> "[F]irst, the court found that striking Williams' name from each ballot in the city at that late date would be impossible and would lead to confusion which might jeopardize other candidates. Second, if Williams ultimately prevailed in court, the results could be released instead of holding a separate election. *** Allowing the election to proceed while suppressing the results was not intended to settle the issue by rendering it moot, but intended instead to facilitate the continuance of the lawsuit without jeopardy to candidates for other offices and to possibly

avoid the expense of another election if Williams prevailed in the suit."

In accordance with the trial court's order, the November 13, 1990, "Chicago Board of Elections Statement of the Results of the Canvass of the Election Returns" listed no vote count and no winner for Judge Kiley's circuit court vacancy. Instead, the election return specifically stated: "PROCLAMATION WITHHELD DUE TO COURT ORDER." The presiding judge of the county division of the circuit court of Cook County, in his order accompanying the Chicago board of elections returns, specifically excluded the vote totals for Kiley's vacancy. Moreover, while the State proclamation issued by the Governor regarding the November 1990 general election included Williams' name, it explicitly stated that Williams' election was subject to litigation. It was thus clear that the election process to fill Kiley's vacancy was suspended while the election contest proceeded.

The instant case is further distinguishable in that no other party ran a candidate against the Democratic nominee for Kiley's position. Additionally, Williams was already occupying Kiley's vacancy during the election contest. Thus, no innocent third party's rights were affected by continuing the election contest, as there likely was in *Harris* and *Bartos*.

Williams, however, argues that the only relevant fact concerning mootness is that the People voted. Thus, the court's order suppressing the election results had no effect, Williams suggests, because the trial court's order itself provided that the election proceed. Williams believes the citizens' right of suffrage outweighs any right McDunn may have had in bringing her election contest. Williams cites no direct authority for this argument, but believes its validity can be seen in the context of the citizens' right of suffrage and the structure of the Election

Code, which compel the conclusion that primary election contests must be decided prior to the general election.

Williams first argues that the Election Code was created in furtherance of the citizens' constitutional right of suffrage, a right of paramount importance and fundamental to our form of government. This importance was recognized by this court in *People ex rel. Burris v. Ryan* (1992), 147 Ill. 2d 270, Williams argues, where this court stated:

> "The most important consideration, and the underlying thrust of this opinion, is the interest of the voters of this State. The interest of the voters mandates holding elections on time." *Burris*, 147 Ill. 2d at 294.

Williams further notes that this court in *Burris* imposed special conditions on the election, thus suspending certain sections of the Election Code so that the election would be held on time to guarantee the citizens' right of suffrage. Williams then notes that this court held in *Fumarolo v. Chicago Board of Education* (1990), 142 Ill. 2d 54, that the right to vote is a fundamental constitutional right and the cornerstone of our democracy.

Williams argues that these two cases reveal that the right to vote supersedes any State law which seeks to inhibit its exercise. Williams further argues that the Election Code, being nothing more than the legislature's attempt at protecting suffrage rights, must be viewed as subservient to the electors' constitutional right of suffrage.

The two decisions Williams relies on did not involve election contests. *Burris* involved legislative redistricting, and *Fumarolo* involved an instance where a statute gave voters with children in school greater voting power in local school elections than voters without children in school. Nothing in these two cases prohibits an election from being declared void *post facto* and rescheduled for having the wrong candidate on the ballot. Moreover,

while the Election Code is the legislature's attempt at protecting the public's suffrage rights, that right is protected by election contests that seek to determine the correct vote of the People and place the person chosen by the voters at the primary election on the general election ballot.

Williams next examines the Election Code and argues the key event in the Code is the general election and that the primary election is insignificant when compared to the general election. Williams concludes that primary election contests must be accelerated and limited in nature. See *Young v. Washington* (1984), 127 Ill. App. 3d 1094.

The facts here permit a different result than Williams urges. The Election Code limits the time in which a primary contest must be filed, but does not limit the time in which the contest must be completed. (Ill. Rev. Stat. 1989, ch. 46, par. 7—63.) The question thus becomes, Has the general election made it impossible for a court to grant effectual relief? As we have just noted, effectual relief may be granted under these facts.

We further note that this court has held a court may hear an election contest even after a candidate been declared the winner, takes an oath and assumes office. (*People ex rel. Cummings v. Head* (1861), 25 Ill. 325.) Williams acknowledges the holding in *Cummings*, but argues that *Cummings* involved a general election contest, and not a primary election contest as here. However, while the instant case involves a primary contest, it also involves a general election where no third party's rights would be affected by the primary election contest, and where the delay in determining the contest was not due to any bad faith by any of the parties. This case must be decided on its own facts.

We conclude that the trial court's order effectively preserved the status quo in this case, and the issue is

not moot. Effective relief can be granted in this case under section 2A—1(e) of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 2A—1(e)).

## VII

### Voters' Right of Suffrage

Williams next argues that the voters' right of suffrage will be denied if he does not continue to serve as a judge because the voters cast their ballots for him at the 1990 general election. Williams notes that the Illinois Constitution guarantees the right to vote and provides that all elections "shall be free and equal." Ill. Const. 1970, art. III, §§1, 3.

No right of suffrage will be denied if Williams does not continue to serve as a judge. Williams did not win the 1990 primary election and thus had no right to run in the 1990 general election to fill Kiley's vacancy. At issue here is the right to vote to fill the judicial vacancy created by Judge Kiley's resignation. That right was exercised by the voters on November 3, 1992, when they elected McDunn to fill Kiley's position.

## VIII

### Laches

Williams next argues that McDunn's claims cannot stand because she is guilty of *laches*, an assertion both the trial court and appellate court dismissed.

"*Laches* is an equitable doctrine which precludes the assertion of a claim by a litigant whose unreasonable delay in raising that claim has prejudiced the opposing party. (*People ex rel. Daley v. Strayhorn* (1988), 121 Ill. 2d 470, 482.) The doctrine is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party. (*Rexroat v. Abatte* (1987), 163 Ill. App. 3d 796, 799.) Two elements are necessary to a

finding of *laches*: (1) lack of diligence by the party asserting the claim and (2) prejudice to the opposing party resulting from the delay. (*Zelazny v. Lyng* (7th Cir. 1988), 853 F.2d 540, 541.)" (*Tully v. State* (1991), 143 Ill. 2d 425, 432.)

Williams asserts that while McDunn's election contest has been found to have been timely filed, "she did not avail herself of the procedural and other remedies necessary to protect her rights and establish her claims prior to the general election."

Williams bases his argument on *Tully*, where this court applied the doctrine of *laches*. *Tully* involved a race for an appellate position that was declared vacant pursuant to the Compulsory Retirement of Judges Act (Judges Act) (Ill. Rev. Stat. 1989, ch. 37, par. 23.71). However, the appellate judge whose seat was declared vacant, Justice White, refused to retire, believing the Judges Act to be unconstitutional. White sent notice to the Secretary of State of his intention to run for retention due to his belief that mandatory retirement was unconstitutional, and was included on the ballot in the general election for retention. On the same ballot were the Democratic and Republican candidates running to fill White's declared vacant seat. A month before the election, Justice Tully, the Democratic nominee running to replace White, brought suit to prevent White from seeking retention. The trial court preserved the status quo until after the election. White was declared retained, and Tully was declared elected to White's vacant office. White then answered Tully's complaint, and the trial court found the Judges Act unconstitutional and ordered that White retain his seat.

On appeal, this court held that White could not lay rightful claim to the appellate position because he was guilty of *laches*. White knew a year in advance that his seat had been declared vacant and that a primary and

general election would be held to fill his seat. However, White failed to bring any legal action to prevent the elections to fill his seat from being held until after the general election, when he filed a response to Tully's suit. This court found that White "slept on his rights" because he should have been aware that a primary and general election would be held to fill his seat, and that candidates would spend considerable time and money in an attempt to fill his seat. White, however, did nothing to prevent this from occurring. *Tully*, 143 Ill. 2d at 434.

Williams argues that while he expended considerable time, energy and money throughout his campaign, McDunn failed to exercise diligence in seeking an order to prevent his name from being placed on the November 6, 1990, ballot. Williams notes that McDunn filed no written motion to strike his name from the ballot, and only orally requested this relief on November 5, 1990, the day before the general election. Williams also argues that McDunn could have instituted discovery while the case was pending in the circuit court and could have petitioned the appellate court, pending review of the trial court's dismissal, to direct the parties to determine whether ballots were uninitialled and to discover facts necessary for a quick adjudication.

There was no lack of diligence on McDunn's part. As McDunn notes, she did everything required of her by the Election Code to contest the primary's results. McDunn filed her election contest in the required time, asking the trial court to proceed in a summary manner, count the ballots, and enter such orders and judgment as justice may require. McDunn also asked the court to declare that she was the elected nominee of the Democratic Party in the 1990 primary to fill Kiley's vacancy and cause a certified copy of said judgment to forthwith be made by the clerk of the court and transmitted

to the State Board of Elections, Cook County clerk, and board of elections commissioners for the City of Chicago. This would have had the effect of placing McDunn's name on the 1990 general election ballot to fill Kiley's vacancy.

After the trial court dismissed McDunn's petition, she sought direct appeal to this court, which was denied, and then appealed to the appellate court, requesting an expedited schedule for appeal. On September 28, 1990, the appellate court reversed the trial court and reinstated McDunn's petition. McDunn then filed an emergency motion for the issuance of the mandate forthwith to allow the trial court to immediately proceed with the action. On October 1, 1990, Williams filed an affidavit of intention to file a petition for leave to appeal to this court, which prompted the appellate court to enter an order on October 2, 1990, directing that the mandate issue on October 9, 1990, unless Williams should file a petition for leave to appeal with the supreme court. On October 5, 1990, Williams filed a petition for leave to appeal to this court. On October 10, 1990, McDunn filed an emergency motion with this court for an order compelling the appellate court to issue its mandate pending consideration by this court of Williams' petition for leave to appeal. This court denied McDunn's motion on October 16, 1990, and McDunn filed a motion to reconsider the next day. This court denied McDunn's motion to reconsider on October 22, 1990, and two days later denied Williams' petition for leave to appeal.

On October 29, 1990, the appellate court issued its mandate reinstating the case. On October 30, 1990, the parties appeared in court, and the matter was continued until the next day, at which time the parties were to argue Williams' motion to dismiss. After denying Williams' motion to dismiss, the trial court found Mc-

Dunn's petition sufficient in law on October 31, 1990, and ordered her to present her case on November 2, 1990. Williams was ordered to present his defense no later than November 5, 1990. On November 5, 1990, the trial court found that McDunn had established a reasonable likelihood of success upon a full recount. Williams then asked for a continuance to allow the presentation of additional evidence. This continuance was granted over McDunn's objection, but the trial court ruled that while the election would proceed, the results should be suppressed to preserve the status quo.

Thus, a review of the record reveals that McDunn did not "sleep on her rights" as Williams contends, and that the doctrine of *laches* does not apply. Moreover, while Williams asks this court to require McDunn to have requested a discovery order from the appellate court, McDunn completed all the discovery required of her pursuant to section 22—9.1 of the Election Code prior to filing the contest petition. (Ill. Rev. Stat. 1989, ch. 46, par. 22—9.1.) We do not believe McDunn was required to request additional discovery at a time when her petition had not been found sufficient to warrant such discovery, and had in fact been dismissed.

## IX

### Whether McDunn's Petition Was Timely Filed

Williams also asserts that McDunn's election contest was not timely filed due to the fact that she amended her initial complaint after the time limitation in which to file a primary election contest. (Ill. Rev. Stat. 1989, ch. 46, par. 7—63.) We need not address this argument, as "no question which was raised or could have been raised in a prior appeal on the merits can be urged on subsequent appeal and those not raised are considered waived." (*Kazubowski v. Kazubowski* (1970), 45 Ill. 2d

405, 413.) Williams could have raised this claim before the appellate court after he succeeded in having McDunn's case dismissed as being untimely filed.

Williams argues, however, that McDunn appealed only the trial court's decision that her *original* petition was untimely, and that the rule in *Kazubowski* does not control because he could not argue on appeal that her *amended* petition was untimely. Williams believes that to answer the question, the appellate court would have had to give an advisory opinion. This contention is without merit. The trial court noted in its order dismissing McDunn's petition that when it granted McDunn leave to file her amended petition, it did not prevent Williams from taking issue with that order. The court's order also noted that it dismissed McDunn's amended petition as well as the original petition.

A trial court's order may be affirmed for any valid reason found in the record, regardless of the reasoning used by the trial court. (*Beckman v. Freeman United Coal Mining Co.* (1988), 123 Ill. 2d 281, 286.) Williams could have argued to the appellate court then, what he argues now, that McDunn's petition should be dismissed because she amended it after the time limitation in which to file primary election contests. If the appellate court agreed, it could have affirmed the trial court's order regardless of the reason given by the trial court.

## X

### Conclusion

We conclude that McDunn won the March 20, 1990, Democratic primary election to fill the judicial vacancy created by Judge Kiley's resignation and that she was properly elected in the November 3, 1992, general elec-

tion to fill that vacancy. McDunn shall be sworn in as a circuit court judge to fill Kiley's vacancy.

Accordingly, the judgment of the appellate court is vacated. The judgment of the circuit court is affirmed.

*Appellate court judgment vacated;*
*circuit court judgment affirmed.*

CHIEF JUSTICE MILLER, specially concurring:

I join the court's opinion. I agree with the majority that we have jurisdiction over the present matter, that Susan J. McDunn was the winner of the 1990 primary election at issue here, and that the appropriate remedy under the Election Code was to permit McDunn to run in the 1992 general election for the judicial vacancy she sought to fill. I write separately to add several comments regarding the relief afforded in this matter.

The trial judge in the present case declined to compel the removal of candidate Williams' name from the 1990 general election ballot but ordered the suppression of the results of that particular election. After determining, in March 1992, that McDunn rather than Williams should be declared the winner of the contested 1990 primary, the trial judge permitted McDunn's name to appear on the 1992 general election ballot to fill the vacancy at issue here. The actions taken by the trial judge in this case were consistent with the provisions of the Election Code.

As the majority opinion notes, section 7—59 of the Code provides that the winner of a primary election is to be "placed on the official ballot at the election then next ensuing." (Ill. Rev. Stat. 1989, ch. 46, par. 7—59.) Candidate McDunn was not declared the winner of the challenged primary until 1992, and placement of her name on the 1992 ballot was within the literal command of that provision. In addition, section 7—63 of the Code provides that the court may "make such orders and en-

ter such judgment as justice may require" in resolving primary election contests. (Ill. Rev. Stat. 1989, ch. 46, par. 7—63.) Finally, section 2A—1(e) of the Code authorizes the court to "order another election without regard to the schedule of elections" if the court finds that an election was void. (Ill. Rev. Stat. 1989, ch. 46, par. 2A—1(e).) Here, the results of the 1990 general election for the vacancy at issue were appropriately suppressed pending a final determination of McDunn's primary election contest. Once the trial judge determined that McDunn was the actual winner of the 1990 primary, he effectively invalidated the 1990 general election for this position and permitted the matter to be resolved at the 1992 general election. The provisions of the Election Code are sufficient to sustain the remedy fashioned by the trial judge and upheld by this court in today's decision.

One of the dissenting justices, however, concludes that neither candidate is entitled to fill the vacancy at issue here: not Williams, because he was not the winner of the 1990 primary, and not McDunn, because she was not the winner of the 1990 general election. Thus, under that dissenting justice's reasoning, a challenge to a primary election must invariably be resolved in time for the general election scheduled for later that year. Clearly, the Election Code contemplates that such matters will be determined expeditiously. I do not believe, however, that the legislature intended in every instance that the prevailing party obtain, prior to the time of the general election, a final judgment in the last court to hear the case and, failing that, without fault on his or her part, gain nothing except the opportunity to run again in a primary election. Under the circumstances of this case, the result proposed in that dissenting opinion would serve only to nullify the statutory provisions discussed above.

As a final matter, I note that the winner of the contested primary at issue here was to run unopposed in the general election for that position. Accordingly, we do not have before us any question regarding the competing interests of another party's candidate, which would substantially affect the type of remedy appropriate in a case such as this.

JUSTICE BILANDIC joins in this special concurrence.

JUSTICE HEIPLE, dissenting:

The parties in this case are contesting for election to a vacant judgeship on the circuit court of Cook County. The facts are somewhat bizarre; the rulings of the trial, appellate and supreme courts even more so.

A vacant seat on the circuit court was created by the resignation of Judge Roger J. Kiley, Jr. The office was certified for nomination and election in 1990. The declared winner of the primary election in March of 1990, James H. Williams, went on to win the general election that November.

## TRIAL COURT DECISION

In March of 1992, sixteen months following the November 1990 general election, the trial court decided that Williams had lost the 1990 primary election to Susan J. McDunn. Thus, the court ruled that Williams was out of office, since a person who loses a primary election should not be listed on the general election ballot in the fall. The 1990 general election being history, the court ordered that McDunn's name should be placed on the ballot for the general election to be held in 1992! This, despite the fact that contestants in the 1990 primary election were specifically seeking the right to run only in the 1990 general election and despite the additional fact

that the 1992 primary election, also now history, was the only vehicle to furnish candidates for the 1992 general election. Since no other person was afforded any opportunity to contest for the 1992 election, the trial judge, by this ruling, effectively appointed McDunn the winner of the yet to be held 1992 general election.

## THE APPELLATE COURT DECISION

On review, the appellate court, in a decision unparalleled in the annals of election contests for both creativity and generosity, decided that both Williams and McDunn should be judges; thus creating two judgeships out of one. For hoary precedent, one may cite back to Genesis and Adam's rib. Intervening statutory and case law, however, furnish no support.

## THE SUPREME COURT OPINION

A majority of this court found the appellate court's creation of a new judicial seat constitutionally flawed. Next it went on to find that McDunn had indeed won the 1990 primary. Finally, it found that McDunn was properly placed on the 1992 ballot.

I am in agreement with the majority up to the point where it found that McDunn was properly placed on the 1992 general election ballot to fill Kiley's vacancy. Up to this point, the analysis was sound and almost excessively thorough. But in part V of the opinion, in a cursory discussion on whether the Election Code authorized McDunn to be placed on the 1992 ballot, the majority briefly waves its magic wand over the statutory language and the facts of this case and concludes yes. Embarrassingly opaque, this clumsy sleight of hand is unconvincing to all but the unconcerned or distracted.

As the majority points out, section 2A—1.2(b)(1) of the Election Code specifically states that:

"(1) in each even-numbered year candidates of political parties shall be nominated for those offices to be filled at the general election *in that year* \*\*\*." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 46, par. 2A—1.2(b)(1).)

There is only one conceivable reading of the phrase "in that year." This means that if a candidate wins a primary in 1990, she has been nominated to be placed on the general election ballot for 1990—not 1992.

The majority asserts that despite the clear language of section 2A—1.2(b)(1), the rest of the Election Code grants the authority for the trial court's ruling. Even a brief analysis of the Code, however, will bring into focus the majority's contortion of the statute.

The majority first points to section 7—59(a) to support its view. Section 7—59(a) provides:

"The person receiving the highest number of votes at a primary as a candidate of a party for the nomination for an office shall be the candidate of that party for such office, and his name as such candidate shall be placed on the official ballot at the election then *next ensuing* \*\*\*." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 46, par. 7—59(a).)

How this section supports the majority's position is a mystery. Rather than supporting the result that the majority strains at, this section merely reinforces section 2A—1.2(b)(1), which the majority concedes could have allowed McDunn to run only in the 1990 general election. 156 Ill. 2d at 323-24.

Sections 2A—1.2(b)(1) and 7—59(a) are logical and consistent with one another. As primary elections are held in the same year as general elections, a candidate who won the primary in 1990 has the right to have his or her name put on the general election ballot for 1990, and only 1990.

The majority next purports to rely on section 7—63 of the Election Code, which details the procedure of primary election contests. This section provides:

> "If the grounds alleged are sufficient in law, the court shall proceed in a summary manner and may hear evidence, examine the returns, recount the ballots and make such orders and enter such judgment as justice may require." (Ill. Rev. Stat. 1989, ch. 46, par. 7—63.)

While this section seemingly gives the trial court broad powers in disposing of a primary election contest, its authority is not unlimited. Significantly, this section only speaks to the disposition of election contests for primaries. While it may be true that the trial court can do what is necessary to determine and declare the actual winner of a primary, no language in this section authorizes the court to put a candidate's name on a subsequent general election ballot two years after the original general election contested for had been held.

Finally, the majority suggests that section 2A—1(e) offers the strongest foundation for today's ruling. This section, however, is similarly insubstantial supporting material. Section 2A—1(e) provides:

> "(e) In the event any court of competent jurisdiction declares an election void, the court may order another election without regard to the schedule of elections set forth in this Article." (Ill. Rev. Stat. 1989, ch. 46, par. 2A—1(e).)

After rotely reciting this section like a magic incantation, the majority attempts to transmogrify the actions of the trial court into what the section allows. Incredibly, the majority finds:

> "What the trial court did, although relying on the general authority found in section 7—63 of the Election Code, was to declare the 1990 general election to fill Kiley's vacancy void, and order another election 'without regard to the schedule of elections ***.' (Ill. Rev. Stat. 1989, ch. 46, par. 2A—1(e).) Thus, the Election Code spe-

cifically provided that the trial court could place McDunn on the *1992* general election ballot to run for Kiley's vacancy, even though she had won the *1990* primary election to run for that vacancy." (Emphasis in original.) (156 Ill. 2d at 324.)

This attempt to convince the reader that the emperor is actually clothed is almost laughable. Not only are these two sentences conclusory and incorrect, they are complete non sequiturs. The trial court did not order a new election. The November 3, 1992, general election for Cook County was going to take place regardless of what happened in this case. Further, as no one else would be aware that Judge Kiley's seat remained open, the trial judge effectively appointed McDunn the winner of the general election. Finally, even assuming that what the trial court did was order a new election, there is still no statutory authority for placing McDunn on the November 1992 general election ballot.

The correct disposition of this case is that Judge Kiley's seat remains open until the next general election. Williams cannot fill the vacancy as he was not the winner of the 1990 Democratic primary and therefore was not properly on the 1990 general election ballot. McDunn cannot fill the vacancy as she was not the winner of the 1992 Democratic primary. The fact that she was the "actual" winner of the 1990 primary is of no moment. She cannot use that election to bootstrap herself into the 1992 general election.

In upholding the trial court's placement of McDunn on the 1992 general election ballot, the majority has turned a blind eye to the clear language of the Election Code. I can only surmise that the majority believes that this is the fair result in this case. After all, McDunn did win the 1990 primary.

It must be remembered, however, that she did not win the 1992 primary—a statutorily imposed prerequisite

to being placed on the 1992 general election ballot. It being decided that the judgeship seat is still open, all eligible citizens must be given the opportunity to participate whether as candidates or electors in a subsequent primary and general election.

McDunn won the 1990 primary election. So be it. Once, however, the 1990 general election had come and gone, McDunn's opportunity to participate in the 1990 general election was *defunctus*. Her only opportunity for the specific relief of getting her candidacy before the voters was to get her primary election contest concluded before the 1990 general election. When that opportunity passed, her candidacy was at an end.

The winning of a party's nomination for the election next ensuing is analogous to having a ticket for a Chicago Bulls basketball game. If you have a ticket and you miss the game, you are out of luck. You do not get a refund and you cannot exchange your expired ticket for another game. Your ticket is good for that day and that game only.

While it may seem harsh that McDunn should lose a judgeship through no fault of her own, the courts are not in a position to formulate an equitable remedy when the statutory directives are clear. We are authorized only to interpret and apply the clear language of the Election Code. Once we have determined that the statute denies her the requested relief, we must not succumb to the temptation to rewrite legislation in order to accomplish what some members of this court may deem a fair result. I submit, however, that this is exactly what the majority has done today.

For the reasons given, I respectfully dissent.

JUSTICE FREEMAN, also dissenting:

I respectfully dissent. I conclude that Williams is the proper occupant of Judge Kiley's seat for two reasons.

First, the 1990 general election rendered McDunn's election contest moot. Second, the uninitialled 1990 primary ballots at issue should be counted.

## MOOTNESS

The trial court was not authorized to put McDunn on the 1992 general election ballot based on 1990 primary results. Although I agree with the reasoning of Justice Heiple as it pertains to McDunn, I reach a different result concerning Williams. I conclude that Williams is the proper occupant of Judge Kiley's seat.

The majority misconstrues the Election Code. The majority erroneously concludes that the Code authorized the trial court to place McDunn on the 1992 general election ballot based on 1990 primary results. However, as Justice Heiple explains, the Election Code does not contain such an authorization. 156 Ill. 2d at 339-42 (Heiple, J., dissenting).

Also, the majority misconstrues McDunn's proper goal in this election contest. The majority apparently views McDunn as seeking to fill Judge Kiley's vacancy without regard to *when* the vacancy is filled—1990, 1992, 2022, or whenever. However, McDunn could properly seek to be a candidate only in the 1990 general election and no other. (See 156 Ill. 2d at 343 (Heiple, J., dissenting).) Indeed, in her election contest petition, McDunn prayed for the following relief:

"WHEREFORE, Petitioner McDUNN prays this Honorable Court:

\* \* \*

3. Ascertains and declares by a judgment \*\*\* finding Petitioner McDUNN the elected nominee of the Democratic Party in said district as a candidate for the office of Judge of the Circuit Court, Cook County Judicial Circuit, inside the City of Chicago, to fill the va-

cancy of the Honorable Roger J. Kiley, Jr. *in the November 6, 1990 general election* \*\*\*." (Emphasis added.)

Thus, even McDunn herself knew that she was seeking to be a candidate not simply to fill a judicial vacancy, but to fill that vacancy in the 1990 general election.

The majority acknowledges the axiom that an issue is moot where events occur that make it impossible for a court to grant effective relief. (156 Ill. 2d at 324-25.) "Because the function of courts is to decide controverted issues in adversary proceedings, moot cases which do not present live issues are not ordinarily entertained." (*People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 622; accord *Wendell v. City of Peoria* (1916), 274 Ill. 613, 615.) Where an action has become moot since it was begun due to changed circumstances, the action will be dismissed. *People ex rel. Jaros v. Jarecki* (1939), 299 Ill. App. 382, 392 (and cases cited therein).

Illinois courts have applied these principles to cases involving elections. Courts have repeatedly found issues concerning elections moot where the elections had already occurred. In each of these cases, the court reasoned that the occurrence of the election prevented the court from granting effective relief. (*People ex rel. Lawrence v. Village of Oak Park* (1934), 356 Ill. 154; *People ex rel. Chancellor v. Sweitzer* (1928), 329 Ill. 380.) Thus, "[w]hen the election took place, the case became moot." *People ex rel. Knight v. Holzman* (1968), 98 Ill. App. 2d 126, 127-28, citing *Sokolowski v. Board of Election Commissioners* (1967), 89 Ill. App. 2d 60; accord *Harris v. Education Officers Electoral Board of Community Consolidated School District 110* (1990), 203 Ill. App. 3d 917; *Bartos v. Chicago Board of Elections* (1989), 191 Ill. App. 3d 937.

Applying these principles to the present case, I conclude that the occurrence of the 1990 general election

rendered moot McDunn's contest of the 1990 primary. The Election Code did not authorize the trial court to place McDunn on the 1992 general election ballot based on 1990 primary results. Thus, the 1990 general election was the determinative event. Once that event occurred, McDunn's candidacy ended.

I also conclude that Williams is the proper occupant of Judge Kiley's seat. Justice Heiple concludes that neither Williams nor McDunn should fill the vacancy. Regarding Williams, Justice Heiple reasons that "he [Williams] was not the winner of the 1990 Democratic primary and therefore was not properly on the 1990 general election ballot." 156 Ill. 2d at 342 (Heiple, J., dissenting).

I disagree. Williams was initially certified as the winner of the 1990 primary. Once the 1990 general election occurred, McDunn could no longer contest Williams' apparent primary victory because the trial court could no longer grant the relief that McDunn sought, i.e., candidacy in the 1990 general election. In other words, Williams properly remained on the 1990 general election ballot because, after the general election occurred, McDunn could no longer contest his presence on the ballot.

## UNINITIALLED BALLOTS

Even if the 1990 general election did not render McDunn's election contest moot, I conclude that Williams is nonetheless the proper occupant of Judge Kiley's seat. As the majority notes, the parties stipulate that if the uninitialled 1990 primary ballots at issue are counted, Williams is the winner of the primary. If the uninitialled ballots are not counted, McDunn is the winner. 156 Ill. 2d at 310.

The majority concludes that the uninitialled ballots at issue cannot be counted, thus making McDunn the

winner. However, I conclude that the uninitialled ballots should have been counted, thus making Williams the winner.

### General Principles

The Election Code provisions at issue amount to a ballot exclusionary rule based on the failure or omission of an election judge to initial a ballot given to a voter. (Ill. Rev. Stat. 1989, ch. 46, pars. 7—44, 7—51, 24A—10.1; see 156 Ill. 2d at 310-11.) The issue before this court is whether this ballot-initialling requirement is mandatory or directory as applied to the facts in the present case.

Whether a statutory provision is directory or mandatory depends on the intent of the legislature. The legislative intent is ascertained by examining the nature and object of the statute and the consequences of any particular construction. The statutory language is often the most reliable evidence of the legislature's intent. *Pullen*, 138 Ill. 2d at 46.

Where a statute, which prescribes duties of election officials, simply prescribes the performance of certain acts in a specific manner and does not expressly state that compliance is essential to the validity of the ballot, then the statute generally will be given a directory construction. A technical violation of a directory provision does not invalidate the affected ballots. However, if the statute expressly states that failure to act as the statute prescribes will void the ballot, the statute will generally be given a mandatory construction. The failure to comply with a mandatory provision renders the affected ballots void. *Pullen*, 138 Ill. 2d at 46.

Prior to *Craig v. Peterson* (1968), 39 Ill. 2d 191, this court held that the ballot-initialling requirement, as applied to both in-precinct and absentee ballots, was mandatory. A ballot without such initials, either in-pre-

cinct or absentee, would not be counted. (*Pullen*, 138 Ill. 2d at 49; *Craig*, 39 Ill. 2d at 194.) The purpose of construing the ballot-initialling requirement as mandatory was to preserve the integrity of an election by preventing a ballot box from being "stuffed" with forged ballots. This court reasoned that an election judge can identify his or her own initials and can detect forged initials. This court concluded that there was no other equally effective method of separating legally cast ballots from those illegally cast. *Craig*, 39 Ill. 2d at 196-97; *Laird v. Williams* (1917), 281 Ill. 233, 238-39.

Also prior to *Craig*, the mandatory construction of the ballot-initialling requirement applied even where voter fraud was absent and the election judge omitted his or her initials through ignorance or mistake. (*Lacy v. Rhodes* (1938), 369 Ill. 167, 169-70.) This court had gone so far as to hold that the purpose of the ballot-initialling requirement outweighs an innocent, qualified voter's loss of franchise. *Tuthill*, 387 Ill. at 330.

### Craig v. Peterson

In *Craig*, this court found an exception to the mandatory construction of the ballot-initialling requirement. The court recognized that a qualified voter has a constitutional right not only to vote, but also to have that vote counted. (*Craig*, 39 Ill. 2d at 195 (and cases cited therein).) Referring to the distinction between a directory and a mandatory construction of statutes, the court stated:

> "And even in those instances wherein the legislature has declared its intention in seemingly mandatory terms, courts have not hesitated to inquire into the reasonableness of such provisions, and, if such regulatory provisions operated unequally upon equally qualified voters [citation] or made no substantial contribution to-

wards insuring the honesty and secrecy of the election, but, rather, were of an arbitrary nature and disenfranchised qualified voters without their fault [citations], have held such provisions unconstitutional." *Craig*, 39 Ill. 2d at 196.

The court in *Craig* held that the mandatory construction of the ballot-initialling requirement does not apply where: (1) a qualified voter will lose his or her right of suffrage without any fault of the voter, and (2) the ballot-initialling requirement does not contribute substantially to the integrity of the election. *Craig*, 39 Ill. 2d at 198-99; see 156 Ill. 2d at 311-13.

As the majority notes, this court has limited the *Craig* exception to the mandatory construction of the ballot-initialling requirement to absentee ballots. In-precinct ballots, and even absentee ballots inseparably mixed with in-precinct ballots, are still subject to the mandatory construction. This court has identified two principal reasons for this distinction. First, a ballot box cannot be "stuffed" with absentee ballots because they are not cast in the polling place and are not opened until after the polls have closed. However, a ballot box can be "stuffed" with in-precinct ballots. Thus, the initialling requirement remains the only means to identify and separate in-precinct ballots that were legally cast from those that were not. *Pullen*, 138 Ill. 2d at 53; *Craig*, 39 Ill. 2d at 200-01.

Second, the risk of disfranchising an in-precinct voter is less than that for an absentee voter. The in-precinct voter can see whether the election judge initialled the ballot, but an absentee voter cannot. (*Craig*, 39 Ill. 2d at 201.) In the present case, the majority accepts this reasoning and construes the ballot-initialling requirement as mandatory, thereby excluding the ballots at issue. 156 Ill. 2d at 311-14.

## Application of *Craig*

I am of the opinion that the mandatory construction of the ballot-initialling requirement is unconstitutional as applied to the facts of this case. I conclude that the *Craig* exception to such construction should apply to the ballots in this case.

It is established that the right to vote, which includes the right to have a vote counted (*Craig*, 39 Ill. 2d at 195), in an election of general interest is a fundamental right. Any legislation which operates to impair a person's right to vote on grounds other than residency, age, or citizenship, can stand only if it can survive strict scrutiny analysis. (*Fumarolo v. Chicago Board of Education* (1990), 142 Ill. 2d 54, 74 (and cases cited therein).) Further:

> "Under a standard of strict scrutiny, the court must conclude that the means employed by the legislature to achieve the stated goal were necessary to advance a compelling State interest. Too, the statute must be narrowly tailored, that is, the legislature must use the least restrictive means consistent with the attainment of the legislative goal." *Fumarolo*, 142 Ill. 2d at 73.

The mandatory construction of the ballot-initialling requirement is unconstitutional as applied to the facts of this case for two reasons. First, it is not necessary to apply the mandatory construction here to achieve the legislative goal of preserving the integrity of the election. I reject the idea that in-precinct balloting is more susceptible to fraud than absentee balloting. It is true that a ballot box can be "stuffed" with forged in-precinct ballots while the polls are open. However, a ballot box can be "stuffed" also with forged absentee ballots after the polls are closed.

On the day of an election, an election authority sends cast absentee ballots, with their accompanying

absentee ballot applications, to their respective precinct polling places. (Ill. Rev. Stat. 1989, ch. 46, pars. 19—2.1, 19—8.) After the polls close, an election judge determines if each absentee ballot was cast by a qualified voter in the precinct. If so, the election judge, at that point, initials the cast absentee ballot and deposits it in the ballot box with the in-precinct ballots. Ill. Rev. Stat. 1989, ch. 46, par. 19—9.

This process shows that absentee balloting is as susceptible to fraud as in-precinct balloting. Both types of ballots receive similar treatment by an election judge. In the context of either absentee or in-precinct balloting, an election judge verifies a voter's identity, residence, and receipt of only one ballot. The election judge then places both types of ballots in the common ballot box. Thus, an election official at a polling place has as much opportunity to "stuff" a ballot box with forged absentee ballots as with forged in-precinct ballots.

I further note that a mandatory construction of the ballot exclusionary rule could actually threaten the integrity of an election. A mandatory construction of such a ballot requirement "would often permit unscrupulous election officers to invalidate elections at will." *State ex rel. Wahl v. Richards* (1949), 44 Del. 566, 581, 64 A.2d 400, 407.

In the present case, the majority acknowledges that the trial court dismissed for lack of proof McDunn's allegation of fraud in the primary. (156 Ill. 2d at 296-97.) Absent allegations of fraud, if it is not necessary to exclude uninitialled absentee ballots to preserve the integrity of an election, then it is not necessary to exclude uninitialled in-precinct ballots.

Second, the mandatory construction of the ballot-initialling requirement was not the least restrictive means to preserve the integrity of this election. *The manda-*

*tory construction is an unconstitutional burden that disfranchises an innocent, qualified voter based on the failure or omission of an election judge.* If the legislature can enact a law whereby election judges can effectively disfranchise all of the voters of a precinct, where those voters are not at fault, then the constitutional right to vote is of small consequence. *Moyer v. Van De Vanter* (1895), 12 Wash. 377, 382, 41 P. 60, 61.

The court in *Moyer* recognized "a distinction between the obligations placed upon the individual voter and those matters which relate to the duties of election officers." (*Moyer*, 12 Wash. at 382, 41 P. at 61.) The court reasoned:

> "The individual voter may well be called upon to see that the requirements of the law *applying to himself* are complied with before casting his ballot, and if he should willfully or carelessly violate the same, there would be no hardship or injustice in depriving him of his vote; but if, on the other hand, he should in good faith comply with the law upon his part, it would be a great hardship were he deprived of his ballot *through some fault or mistake of an election officer* in failing to comply with a provision of the law over which the voter had no control." (Emphasis added.) *Moyer*, 12 Wash. at 382-83, 41 P. at 61.

It is an unnecessary burden to require each in-precinct voter to know the ballot-initialling requirement and to search his or her ballot for an election judge's initials. Contrary to the majority's assertion (156 Ill. 2d at 318), a voter's constitutional right to have his ballot counted should not depend on his ability to detect the failure or omission of an election judge. Indeed, the majority refers to the presumption that election officials perform their statutory duties. (156 Ill. 2d at 318.) This is all the more reason for an innocent voter *not* to search his ballot for an election judge's mistake or omission, but rather to rely on the pre-

sumption that the election judge had given him a legal ballot.

The court in *Moyer* recognized that less restrictive means existed to protect the integrity of an election. If an election judge is determined to have violated an Election Code provision, the judge can be punished "and in this way the law can be rendered effectual without going to the extent of depriving the voter of his right to have his vote counted in consequence of such violation." *Moyer*, 12 Wash. at 384, 41 P. at 62.

I lastly note that these views are not new to this court. In *Slenker v. Engel* (1911), 250 Ill. 499, this court ruled that certain ballots could not be counted because they lacked the initials of an election judge. (*Slenker*, 250 Ill. at 510-11.) Dissenting, Chief Justice Carter stated in pertinent part:

> "A voter should not be deprived of his vote by a mistake of election officers where he is not at fault, and the ballot itself, or other evidence in the record, shows that the ballot is genuine, delivered by the judges to the voter and by him voted, and that the lack of the judges' initials was caused by mistake. The initials of a judge in his handwriting are for the purpose of identifying the ballot, but if the ballot can be fully identified, even in the absence of the initials, and it is shown that it was cast by a legal voter, it should be counted." *Slenker*, 250 Ill. at 511-12 (Carter, C.J., dissenting).

I would reverse the appellate and trial courts. Accordingly, I respectfully dissent.